**MEAD'S BAKERY, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent,**

No. 21996.

United States Court of Appeals
Fifth Circuit.
July 19, 1966.

Donald L. Wilson, Brooks, Tarlton, Wilson & Gilbert, Fort Worth, Tex., for appellant.

Edward L. Rogers, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., David O. Walter, Lee A. Jackson, Attys., Dept. of Justice, John B. Jones, Jr., Acting Asst. Atty. Gen., S. S. Cohen, Chief Counsel, Glen E. Hardy, Atty., I. R. S., Washington, D. C., for respondent.

Before BROWN and COLEMAN, Circuit Judges, and MORGAN, District Judge.

MORGAN, District Judge.

Mead's Bakery, Inc., petitions for a review of a decision of the Tax Court involving deficiencies in its corporate income for its taxable years ended April 30, 1956, 1957, and 1958, in the respective amounts of $41,735.30, $24,240.14, and $8,328.75. The decision of the Tax Court we are called upon to review under Section 7482 of the Internal Revenue Code of 1954 was entered on April 22, 1964, and in its "Memorandum of Findings of Fact and Opinion" comprising 34 pages of the printed record,[1] the Tax Court concluded that the amounts advanced to petitioner's affiliate, in each of the years in question, represented. unreasonable accumulation of earnings, and that petitioner, during the years in issue, was availed of for the purpose of avoiding the income tax with respect to its shareholders. The Tax Court held, however, that the earnings retained by taxpayer in excess of the amounts advanced to its affiliate were retained to meet the reasonable needs of its business, and taxpayer is entitled to an accumulated earnings credit based thereon.

The petitioner was incorporated as a Delaware corporation on April 27, 1955. Shortly after it was incorporated, it acquired, in a tax-free reorganization, the assets of (and assumed the liabilities of) four predecessor corporations which were then dissolved, the taxpayer's stock being distributed among their stockholders. The taxpayer's stock is owned approximately as follows: E. P. Mead, taxpayer's president, 60 percent; Ed V. Mead, his son and vice-president, 31 percent; and the remaining stock is held by other members of the Mead family.

The Mead family has been engaged in the manufacture and wholesale distribution of bread in the southwest since at least 1938. They began as a sole proprietorship, and later conducted business through four predecessor corporations. Between 1938 and May 1, 1955, they acquired 21 bakery plants, 14 of which were acquired since 1946. Since 1938 to the present time, the Mead family's activities in this business reflect sustained growth, expansion and diversification.

As of May 1, 1955, much of the taxpayer's plant equipment was in need of replacement. The acquisition of the 14 plants since 1946 had, however, depleted the former corporations' earnings and adversely affected their ability to add to and replace equipment from 1946 to 1955. Taxpayer's management estimated that, upon an acquisition, losses equal to acquisition costs would be incurred before the new plant would operate on a profitable basis.

In July, 1955, the taxpayer found its cash balances insufficient for purposes of conducting business and, accordingly, borrowed funds to obtain working capital. However, because of the terms of several of the loans which it obtained for this purpose, the taxpayer in effect was unable to expand by means of debt financing, and, thus, during the period of these loans, the taxpayer could finance the acquisition of new plants, diversifica-

---

1. Unofficially reported in 23 T.C.M. ——, T.C. Memo 1964–104.

tion into new lines of business, or the purchase of equipment to any substantial extent only by retaining earnings.

Because of population growth in the cities served by the taxpayer's principal bakeries, new routes had to be continuously developed to meet competition at a cost of approximately $10,000.00 for each new route. The Tax Court found that 41 new routes were added during the first tax year in question. Simple computation shows an expense of $410,000.00 was thus incurred.

The taxpayer's expenditures for additions to its existing plants and equipment during the years in question necessitated by competitive pressures, rising costs, and increasing populations of the cities it served, exceeded its depreciation allowed during this period by $170,-000.00.

During this period, there were innovations in the bakery business, which required new types of bread and new processes in wrapping bread loaves, all of which innovations influenced taxpayer's management to retain earnings to utilize them. A new "continuous mixing" method became available for making bread which would cost $150,000.00 per plant. The Tax Court found that by 1956 the petitioner had "made definite plans to begin converting its ten largest bakery plants to the continuous mix process * * *".

Also, because the consumption of refrigerated biscuits was cutting directly into the bread market, the taxpayer felt it should protect its share of the market by expanding into the biscuit business. Taxpayer retained earnings during these years because of the threat of reduced profits from price cutting by bakery-operated chain stores, and from possible losses that might occur because of labor disputes. The taxpayer also was faced with a new trend in the baking business towards more credit and larger receivables in their trade accounts. During these years, taxpayer was faced with contingent tax liabilities in excess of $385,000.00 arising out of deficiences asserted against the four predecessor cor-

porations. The Tax Court held that the taxpayer's investments in securities to meet these contingencies were not unreasonable accumulations; nor were advances to a corporation constructing buildings owned by E. P. Mead, a stockholder, for installation of special features such as plumbing, wiring, and other unique features required in the baking industry, unreasonable. Ed V. Mead and E. P. Mead secured advances from the taxpayer during these years, but these advances had been repaid, and, indeed, both Meads extended substantially more credit to the taxpayer than either received from it. The Tax Court held that these advances on open accounts to its stockholders were not unreasonable.

Thus, the sole question for review is whether the Tax Court was "clearly erroneous" in its determination that the advances made by petitioner evidenced a purpose to use the corporation as a means to accumulate earnings in violation of Section 531, Internal Revenue Code.

During the years in issue, the taxpayer owned 98 percent of the outstanding stock in Mead's Angus Mesa, Inc. (hereinafter referred to as Angus). The taxpayer filed its returns with Angus on a consolidated basis. Taxpayer acquired the Angus stock in connection with its acquisition on May 1, 1955, of the four predecessor corporations. Angus had been organized on August 12, 1953 (and was subsequently owned) by one of the predecessor corporations (hereinafter referred to as El Paso) to engage in raising and breeding an elite show herd of Aberdeen Angus cattle. The cattle raising operation took place on an 1800-acre ranch owned by Angus in Albuquerque, New Mexico. Angus also owned a farm of approximately 180 acres in Albuquerque which it acquired for approximately $175,000.00. Ed V. Mead, formerly the president of El Paso, and, during the years in issue, vice-president of the taxpayer, resided at all times relevant here to in a house located on the farm. After a Revenue Agent made an income adjustment to Angus' return for 1956 for unreported rental income of $4200.00, An-

gus, in subsequent years began to report rental income for the quarters occupied by Ed V. Mead.

Prior to the taxpayer's absorption of the four predecessor corporations, Angus possessed a herd of 100 breeding cows and a one-half interest in a prize stud bull. Angus had acquired these cattle at a cost of $129,734.00. Shortly after the May 1, 1955, reorganization, the taxpayer decided that Angus cattle-raising activities constituted too much of a strain on its working capital, and that such activities should be terminated immediately and the cattle disposed of as soon as possible. The cattle were sold at auction in October, 1955. Thereafter, the sole activity engaged in by Angus, aside from leasing the house on its farm to Ed V. Mead and selling unneeded equipment, was to lease, on a share-crop basis, a portion of its land for the cultivation of hay. Angus had the following gross receipts from the sale of hay:

| Fiscal Year Ended | Amount |
|---|---|
| April 30, 1956 | $ — |
| April 30, 1957 | 5,544.75 |
| April 30, 1958 | 4,748.20 |
| April 30, 1959 | 1,753.58 |

Neither Ed V. Mead nor any other officer of Angus or the taxpayer devoted any of his time to the affairs of Angus.

Between the years 1955 and 1960, Angus sustained the following losses:

| Fiscal Year Ended | Amount |
|---|---|
| April 30, 1955 | $178,607.80 |
| April 30, 1956 | 104,702.32 |
| April 30, 1957 | 32,699.70 |
| April 30, 1958 | 20,464.91 |
| April 30, 1959 | 34,174.62 |
| April 30, 1960 | 21,173.47 |
| Total .... | $391,822.82 |

During each of the years involved, taxpayer advanced substantial amounts on open account to Angus. Taxpayer advanced not less than $88,155.14 to Angus for its fiscal year ended April 30, 1956; it advanced $50,000.00 to Angus during its fiscal year 1957, and $77,889.-62 during 1958.

The consolidated balance sheets reflecting, on a consolidated basis, the assets and liabilities of the taxpayer and its subsidiary, Angus, during the years before the Tax Court show that taxpayer had a taxable income for the year 1956 of $88,155.14; 1957, $559,695.76; and 1958, $488,211.24.

Taxpayer retained all of its earnings during the years in issue. Neither the taxpayer nor any of the predecessor corporations has ever declared or paid a taxable dividend.

During the calendar years 1956 through 1958, E. P. Mead filed joint federal income tax returns with his wife, Jessie Mead, and reported taxable income thereon which put them in the tax bracket of 20 percent, 62 percent, and 53 percent, respectively.

During this same period, Ed V. Mead filed joint returns with his wife, Elizabeth Mead. They reported taxable income thereon which put them in tax brackets of 53 percent, 56 percent, and 56 percent for these years.

On March 21, 1961, the Commissioner, pursuant to Section 534 of the Internal Revenue Code of 1954, notified the taxpayer that he intended to issue a deficiency notice for the taxable years ended April 30, 1956, through April 30, 1958, based on Section 531 of the 1954 Code. The taxpayer did not submit a statement of grounds, as permitted under Section 534(c) of the Code.

The Tax Court held that the taxpayer rebutted any inference of unreasonable accumulations excepting the amounts advanced by the taxpayer to Angus during the years involved. However, the Court held, to the extent of such advances to Angus, the taxpayer was availed for the purpose proscribed by Section 532 of the Internal Revenue Code of 1954. Under the decision the taxpayer was allowed an accumulated earnings credit pursuant to Section 535 of the Code for all of the taxpayer's earnings during the years in question, excepting the amounts advanced

to Angus which were held taxable pursuant to Section 531 et seq.

The sole question now presented in whether the Tax Court was correct in holding that the taxpayer, by permitting its earnings to accumulate to the extent of its advances during the taxable years here involved to its subsidiary, Angus, was availed of for the purpose of avoiding income tax on its stockholders within the meaning of Section 532 of the Internal Revenue Code of 1954.

Sections 531 through 537 of the Internal Revenue Code of 1954 impose an accumulated earnings tax on every corporation formed or availed of for the purpose of avoiding income tax on its shareholders by permitting earnings and profits to accumulate instead of being divided and distributed. The tax is imposed on the accumulated taxable income, except that under the 1954 Code (unlike former law), a credit against the accumulated taxable income is allowed for the portion (if any) of accumulated earnings retained for the reasonable needs of the business; the remainder of the accumulated earnings is subjected to the tax. As an aid in determining whether or not the corporation has been availed of for the proscribed purpose, the fact that earnings and profits are permitted to accumulate beyond the reasonable needs of the business is determinative of the purpose to avoid tax on shareholders unless the corporation proves the contrary by a preponderance of the evidence.

Here, the Tax Court held that the taxpayer—who had the burden of proof as to the reasonableness of the accumulations as well as on the ultimate issue of the proscribed purpose—while establishing that to some extent earnings had been retained to meet the reasonable needs of its business (the Court thus modifying the Commissioner's determination by the allowance of a credit for the portion of the earnings retained for those needs), the advances to Angus, its subsidiary, represented investments unrelated to its business, and that, to the extent that the taxpayer could make such unrelated investments, the advances were not neces-

sary for use in its business. It held further that the taxpayer had failed to prove by a preponderance of the evidence that these advances, since beyond the reasonable needs of its business, were not accumulated and diverted from its business for the proscribed purpose of avoiding the tax on its stockholders.

It is true that taxpayer had substantial profits during the period in issue; that neither it nor its predecessors had ever declared a taxable dividend; and that dividends distributed to its controlling shareholders would have been subject to tax at a rate of more than 50 percent. On the other hand, the Tax Court found impressive evidence of taxpayer's business needs, although it noted that "evidence * * * as to the specific amount of these needs is somewhat inconclusive". But the only factor which indicated to the Court that taxpayer had accumulated earnings beyond the needs of its business was the advances to Angus. The Court held that Angus was not engaged in business.

The Court held that taxpayer "failed to prove that its reasonable business needs * * * exceeded the amount of earnings retained * * * minus the amount advanced to Angus" and "failed to prove that the amounts advanced to Angus * * * would not have been available to distribute * * * as dividends". This holding is not supported by the Court's findings of needs which added, exceed $4,000,000.00 and of retained earnings of only $550,000.00. The Tax Court didn't question the bona fides of these needs. Instead, the gist of the Court's opinion, and appellee's argument on appeal, is that regardless of the extent of taxpayer's needs (or the fact that they mathematically exceed retained earnings), that part of its earnings advanced to Angus was not retained for the purpose of meeting those needs.

Treasury Regulations § 1.537–2(c) provides that investments in properties unrelated to the activities of the business of the taxpayer *may* indicate that earnings are being accumulated beyond the reasonable needs of its business. Treas-

ury Regulations § 1.537–3(b) provides that a taxpayer's business may be regarded as including the business of a subsidiary in which it owns at least 80 percent of the voting stock, but "the business of one corporation does not include the business of another * * * [which is] not engaged in the active conduct of a trade or business".

■ The Tax Court's holding that Angus was not engaged in the active conduct of business during the years in issue is not clearly erroneous. Regardless of management's intent to make Angus a profitable diversification when it was organized, in 1955 hopes were abandoned and there was a radical curtailment of operations. Though the taxpayer argues that the Tax Court is bound by a stipulation of both parties to the effect that Angus, during the years in issue, was engaged in the agricultural and livestock business, the Court properly concluded that it was not bound by stipulations of law or stipulations of fact which appear contrary to facts disclosed by the record.

■ The taxpayer has shown that it had reasonable needs in excess of its retained earnings. Generally, the diversion of earnings from a taxpayer's business and its reasonable business needs for use in activities or investments unrelated to that business is usually persuasive evidence that the diverted earnings are not reasonably needed in the business and/or that the corporation is being availed of for the proscribed purpose. Helvering v. National Grocery Co., 304 U.S. 282, 291, 58 S.Ct. 932, 82 L.Ed. 1346; Barrow Manufacturing Co. v. Commissioner, (5 Cir. 1961) 294 F.2d 79, 80, cert. den. 369 U.S. 817, 82 S.Ct. 827, 7 L.Ed.2d 783; Raymond I. Smith, Inc. v. Commissioner, (9 Cir. 1961) 292 F.2d 470, 472–473, 475.

■ In certain instances, where the total retained earnings are not "beyond the reasonable needs of the business", liability for the tax has been incurred. In such situations, while the extent of the reasonable needs of the business remains a very important factor in deciding the ultimate question, the determinative inquiry is whether or not the challenged accumulation is being *held for* the reasonably anticipated needs of the corporation's business or for the proscribed purpose of avoiding the tax on its shareholders. Young Motor Co. v. Commissioner, (1 Cir. 1964) 339 F.2d 481, 483, Semagraph Co. v. Commissioner, (4 Cir. 1945) 152 F.2d 62, 64–65.

In such instances where retained earnings were found not to be beyond the reasonable needs of the business, yet the liability for the tax was still incurred, the Courts' decisions have usually turned on the fact that plans for the use of such accumulated funds have not been specific or particular, or that the investment of such funds has been of a long-term, nonliquid nature with the Tax Court finding that such investments were not being *held for* the reasonably anticipated needs of the corporation's business. For example, in the *Young* case, the Court stated:

"It is true that Young's testimony that he contemplated some investment of further funds in the company's business was well documented. However, it did not appear that he had set his mind to any particular plans, or to the involvement of any particular amount of money."

■ In the instant case, not only were Mead's plans for expansion and improvement specific, but the Tax Court found that the corporation had initiated several of the proposed uses of the funds and was in the process of further initiating others.

Thus, we do not feel that this case falls within the line of cases where the tax is incurred even though accumulated earnings do not exceed reasonable needs. It is apparent that the taxpayer's advances to Angus were used primarily to make mortgage payments on the land which was considered valuable and which Angus continued to hold from 1955 through 1960.

For the foregoing reasons, the decision of the Tax Court with regard to its determination that the advances to Angus subjected Mead to the accumulated earnings tax is reversed with directions to enter judgment for the petitioner.