**SIMONS–EASTERN COMPANY, formerly Eastern Engineering Company**

v.

**UNITED STATES of America.**

**Civ. A. No. 15081.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 21, 1972.

Poole, Pearce & Cooper, Atlanta, Ga., for plaintiff.

John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Asst. U. S. Atty., Atlanta, Ga., Jack D. Warren, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

SIDNEY O. SMITH, Jr., Chief Judge.

This is a suit brought by the taxpayer to recover the sum of $232,659.29 as-

sessed by the government as accumulated earnings taxes under Section 531 of the Internal Revenue Code of 1954 (26 U.S.C. § 531) for the fiscal years ending January 31, 1966, 1967 and 1968. The statutes in question provide:

"IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000." (26 U.S.C. § 531)

"CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) *General Rule.*—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." * * * * (26 U.S.C. § 532)

Under the pretrial order, the questions for decision are:

(1) Did plaintiff permit its earnings and profits to accumulate beyond the reasonable needs of the business, which includes the reasonably anticipated needs of the business? If there is a finding of "yes" in answer to this question, then another issue is presented;

(2) Were such accumulations made with the intent or purpose of avoiding the income tax upon the shareholders of the plaintiff? If there is a finding of "yes" in

answer to this question, then the third issue is presented;

(3) What part of the earnings and/or profits of plaintiff was accumulated beyond the reasonable needs of the business which includes the reasonably anticipated needs of the business?

The case was tried non-jury and the facts themselves are not too complicated. In essence, they show the retention of substantial earnings by the young company for the years in question and some apparent future needs in its growth. The difficulty lies in ascertaining the proper standards under which the court must review the situation retrospectively.

BACKGROUND.

In 1958, the taxpayer's predecessor, Eastern Engineering Company, was organized in Atlanta. In 1970, agreements were entered into, permitting H. A. Simons, Ltd. to acquire a majority interest in the corporation and its name was changed. Its founders were eight former employees of J. E. Sirrine & Co. of Greenville, S. C., professional architects, engineers and consultants. Eastern was originally formed to specialize in the construction of operating units for the pulp and paper industry. Traditionally, such projects are large in scope and value, running upwards to 75 or 100 million dollars. Consequently, they require long periods of planning in the pre-employment stage as well as the pre-construction stage. Additionally, the industry itself is somewhat cyclical in nature as it expands periodically with technological changes as well as demand.

Eastern began business with the original "Atlanta 8" plus a small staff. It was capitalized at $250,000 of which some $125,000 was paid in from the savings and borrowed money of the original stockholders, none of whom are related. From the outset the stockholders operated under an agreement by which each could be limited to 10% of ownership and, upon request each must offer the company repurchase of his holdings at

book value before selling to an outsider. In addition, there was a buy-out agreement upon death or termination. In the beginning, the founders more or less allowed themselves three years to become established. In so doing, they limited themselves to minimal salaries and moderate quarters and worked "outside" to keep the business going. The early years were difficult as the company competed with larger experienced firms in seeking the larger more lucrative accounts. In addition, they faced the built-in delay in such projects. In particular one job—the Orient Paper Company—caused a considerable cash bind in this regard. As a result, its prospects were shaky through the fiscal year ending in 1962. In that year, one of the original founders, Cantrell, left and it was desirable to repurchase his stock at some $30,000 under the redemption agreement. The loss for the preceding year was some $65,000 and no dividends had ever been paid. The accumulated operating loss up to such time was $35,000.

From that point on, however, Eastern became a smash success. It rapidly expanded from its original complement of 20 to a staff of 120 to 150 highly specialized professional experts. In many respects, it "grew like Topsy". The offices were enlarged in a haphazard manner through several floors until they finally utilized as many as five floors in three different buildings in downtown Atlanta. Management was so busy on current business that it gave little thought to long-range plans. In fact, the day-to-day and month-to-month problems were all consuming. By 1965, it had experienced three banner years of earnings on total annual billings of over three million dollars and its earned surplus had erased the deficit and increased to $352,000 after payment of taxes and very meager dividends. For that year and the three in question its financial picture appears thusly:

| FYE 1/31 | Net Income After Taxes | Cash Dividends Declared | Earned Surplus | Working Capital |
|---|---|---|---|---|
| 1965 | $120,267 | $17,593 | $352,394 | $ 529,541 |
| 1966 | 320,551 | 34,056 | 610,720 | 832,348 |
| 1967 | 374,703 | 51,445 | 924,372 | 1,147,907 * |
| 1968 | 96,273 | 27,041 | 951,121 | 1,181,777 * |

* Not including an investment in land in Greenville, S.C. for $42,500 in FY 1967.

Against this background, the government has calculated under the so-called *Bardahl*[1] formula total excess earnings retained for the years in question of:

| FY 1966 | FY 1967 | FY 1968 |
|---|---|---|
| $464,219.13 | $725,246.33 | $738,150.26 (D #11). |

Taxes have been assessed accordingly under Sec. 531 at:

| | | |
|---|---|---|
| $ 99,601.08 | $113,987.69 | $ 19,070.52. |

Originally, an additional $43,190.42 was assessed as "interest," but it has since been refunded to the plaintiff.

*The operating reserve.*

■ The government approach under *Bardahl,* of course, makes allowance for working capital for one "operating cycle." The need for some such reserve is generally well-recognized in every case. Hardin v. United States, 461 F.2d 865 (5th Cir. 1972); Motor Fuel Carriers, Inc. v. United States, 322 F.2d 576 (5th Cir. 1963); Barrow Manufacturing Company v. C. I. R., 294 F.2d 79 (5th Cir. 1961); Smoot Sand & Gravel Corp. v. Commissioner of Int. Rev., 241 F.2d

1. Bardahl Manufacturing Co. v. Commissioner, 24 T.C.M. 1030 (1965), which first delineated this formula approach to calculate allowable operating capital reserves for a manufacturing concern.

197 (4th Cir. 1957), cert. den. 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437. However, in *Bardahl* as in *Apollo*,[2] there is a built-in calculation attributable to rate of turn-over for inventory of goods. As seen, the plaintiff is strictly a service organization and this makes a manufacturing formula inappropriate for rigid application. Moreover, "it has no magic" and the soundest approach seems to call for an examination of the particular needs of the business in question. Neither the taxpayer nor the government is bound by the rigidity of the mathematical precision of *Bardahl* nor of a set period. See Sterling Distributors, Inc. v. United States, 313 F.2d 803 (5th Cir. 1963), reflecting the old standard of "one years operating expenses."

In this context, the taxpayer argues that it should be allowed a cycle of six months, and not altogether unreasonably. The strength of the business and really its only asset is brainpower in the form of highly educated skilled technicians. They must be available first to attract a client and secondly, to execute his needs and projects efficiently. Assuming a decline in business for a quarter or more (as happened in FY 1968), it would be foolhardy to have an abrupt reduction in force by discharging those highly paid specialists already recruited and trained at considerable expense. Indeed, its ability to recoup is dependent upon their continued availability. For this purpose, the court finds that the professional and technical payroll reasonably runs some $150,000 per month. Consequently, the taxpayer claims it should be allowed an operating reserve of, at least, six times that payroll. Recognizing the marked difference in such personnel from the ordinary clerical employee, the court scarcely believes that the principals would reasonably sustain an inactive force for that long. However, it is apparent to the court that the *Bardahl* approach does not take into account this particular need of a service business at the professional level.

Generally, Eastern's customers are extremely solvent and there is little delay in prompt remittance for monthly billings. Nor is there any appreciable loss for "bad debts", although there is occasional adjustment of an account on a complaint basis. All in all, *if* the company can get the business it remains highly liquid. The preservation of the working elite for a reasonable time is necessary for some other contingency. The government without any allowance for such reserve, has calculated the operating cycle as follows:

| | FY 1966 | FY 1967 | FY 1968 |
|---|---|---|---|
| Number days | 44.436 | 38.328 | 47.919 |
| Operating reserve | $368,128.88 | $422,660.60 | $443,626.88. |

Such amounts would ordinarily be sufficient reserve to carry the firm through one cycle of total operations. For the reasons enunciated the court concludes that there should be added to such figure a reasonable professional and technical pay-roll only for an additional period of two months, or 60 days.[3] This would allow sufficient reserve for one cycle of full operation plus a reasonable period, i. e. 60 days, of curtailed operation to recapture business or, in the alternative, to face up to hard decisions on reducing the scope of the entire operation, or abandoning it. Thus, the operating reserve allowed should be increased by $300,000 for each year in question.

At trial, the court was intrigued with the idea that this reservoir of talent constituted the "real" inventory of this

2. Apollo Industries, Inc. v. C.I.R., 358 F. 2d 867 (1st Cir. 1966).

3. In point of fact, the court realizes that in the event of a severe reduction or cessation of business, the company could not cease all other expenses nor release all other personnel. In such a disaster, un-doubtedly some reduction of professional force would be made down to a "safe" level and other expenses would actually be absorbed in the savings. However, a multiple of reasonable professional and technical salaries is a useful tool for making a sound estimate for operating reserve.

company, which turned for salary purposes (and presumably for notice of termination purposes under State law) on a 30-day cycle. Adding this turnover cycle of 30 days to the *Bardahl* turnover of X days for all other purposes (at 1966=74.436 days; 1967=68.328 days; 1968=77.919 days), some interesting results occur in the computations. As calculated, the comparisons are as follows:

| | 1966 | 1967 | 1968 |
|---|---|---|---|
| Gov't operating reserve: | $368,128.88 | $422,660.60 | $443,626.88 |
| Plus 60-day professional payroll | 668,128.88 | 722,660.60 | 743,626.88 |
| Revised Bardahl with 30-day personnel turnover: | 616,663.07 | 753,484.45 | 721,362.36. |

Thus if the assumption of a 30-day cycle for "turnover" of the inventory of professional personnel is valid, the resulting total reserves for *full* operation are remarkably similar to the court's estimate for a reduced operation for the additional two months, or 60 days.

◼ In summary, the court concludes that for a professional service company with no inventory of saleable goods, the accumulation of reserves for one full operating cycle under *Bardahl* plus 60 days of professional payroll constitutes a reasonable operating reserve. It follows that any accumulation beyond that figure is unreasonable unless justified as a particular business necessity. Cf.

Mead's Bakery, Inc. v. C. I. R., 364 F.2d 101 (5th Cir. 1966).

*The specific reserves.*

◼ Of primary concern to the court at trial was the problem of "retrospective justification" of the accumulated reserves. Thus, from the evidence presented by plaintiff, it was not difficult to say in 1972 that a certain amount would have been a reasonable reserve for various business purposes in 1966, 1967 and 1968. On the other hand, the government contended that the regulatory scheme prohibits hindsight reasoning and that the plans in each year must be "specific, definite and feasible" [4] to jus-

4. Section 1.537-1 (26 CFR) of the regulations provides in full:
"REASONABLE NEEDS OF THE BUSINESS.
(a) *In general.* The term 'reasonable needs of the business' includes the reasonably anticipated needs of the business. An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. The need to retain earnings and profits must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. * * * The extent to which earnings and profits have been distributed by the corporation may be taken into account in determining whether or not retained earnings and profits exceed the reasonable needs of the business. * * * "
"(b) *Reasonable anticipated needs.*—(1) In order for a corporation to justify an ac-

cumulation of earnings and profits for reasonably anticipated future needs, *there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation.* Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. *Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.*"
"(2) *Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year.* Thus, subsequent events

tify the accumulation. Upon further examination, the court agrees that the regulations are reasonable and appropriate in this regard. There is no practical limit to the desirable uses for which a business might need reserves and the penalties of Section 531 could be avoided entirely if the accumulation can be justified on afterthought. Therefore, the court concludes that there must be sufficient delineation of the reserves during the taxable year to warrant their acceptance, and that a general or uncertain idea of their possible or theoretical future need in the minds of corporate officers or directors is insufficient to do so. See generally in this regard Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275 (10th Cir. 1971); Bahan Textile Machinery Co., Inc. v. United States, 453 F.2d 1100 (4th Cir. 1972); Schenuit Rubber Company v. United States, 293 F.Supp. 280 (D.Md.1968) as well as the Fifth Circuit cases of *Hardin* and *Barrow Manufacturing Company*, previously cited.

█ The various specific needs other than operating funds advanced at trial must be viewed from this premise. In doing so the court deems only the questions of stock repurchase and future building plans worthy of special consideration. There is no question in the court's mind that either would have been an appropriate business need and that a reasonable accumulation for each would have been proper under a specific plan for such purpose. The court has carefully reviewed the testimony and corporate minutes in this regard. There is no question but that both were considered by the Directors as possible contingencies during the years in question.

As seen, Eastern had repurchased some $30,000 worth of stock in 1962 when it could ill afford to; and, moreover, made minor and major redemptions afterwards and during the years in question. While the repurchase option was desirable for this type of corporation, it was not mandatory. Even so, the adoption of a firm policy and the setting aside of a reasonable sum or percentage of book for such purpose could have passed muster. However, the court finds no "specific, definite, or feasible" plan in existence for such purpose, but only a vague and uncertain idea of its need and amount in the minds of some of the directors. Accordingly, any theoretical accumulation for such purpose is rejected.

█ As early as 1966, when the company began to run into major housing problems in expanding and also faced the dispersal of considerable business activity from downtown Atlanta to satellite office centers, the company formed a committee to study the problem. However, through repeated informal studies, site inspections and reports, the Board vacillated in its consideration of purchase, building or rental and there was no clear decision one way or another, at least until the meeting and resolution of April 1, 1967. At that time, the Board had in hand the feasibility study of financing prepared by Peat, Marwick, Mitchell & Co. under date of March 28, 1967. While the plans of that time did not result in a building, subsequent events such as the purchase of land and materials, the preparation of detailed plans at considerable expense, the timing of rental lease terminations and the like are convincing that the building project was real and bona fide throughout 1967

shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations." (Emphasis supplied)

and afterwards until 1969 when it was "shelved", but not yet abandoned. Reg. 1.537–1 itself provides that subsequent events, such as the failure to build as planned, do not destroy the efficacy of the accumulation if it was justified at the close of the taxable year. In this instance, the court finds that a building reserve was a reasonably anticipated business need during the FY 1968. In terms of amount, the $350,000 reserve for the purchase of land and equity before financing as documented in the resolution of April 1, 1967, is not unreasonable in view of the projected cost of one million or more. Accordingly, the allowable reserves for FY 1968 should also be increased by that amount.[5]

■ In summary and in answer to question (1) the court finds that the following total amounts are the reasonable accumulation of reserves for the plaintiff for the years in question:

| FY 1966 | FY 1967 | FY 1968 |
|---|---|---|
| $668,128.88 | $722,660.60 | $1,093,626.88. |

The difference in such sums and the net quick assets or working capital, at the close of such years would therefore be a proper basis for the assessment of Section 531 penalties (Question 3), if the requisite intent is found to be present.

*Intent.*

■ It is apparent to the court that intent, or more properly motive, is an important and viable issue in any Sec. 531 trial. It is true that once any unreasonable accumulation is shown, as here, there is a presumption of intent to avoid taxes under Sec. 533.[6] Further, tax avoidance need not be the dominant or sole motivation; "it is sufficient if a tax avoidance motive was one of the underlying purposes." Hardin v. United States, 461 F.2d 865 (5th Cir. 1972). However, under *Donruss*,[7] the element of intent is a necessary part of the claim as the Section 531 penalties are imposed not on the unreasonable accumulation itself, but on doing so with tax avoidance as a motive. Of course, it is necessary to overcome the presumption by a "preponderance of the evidence," but no longer by a "clear preponderance of the evidence" as was the case formerly. In this case, the court feels the plaintiff has met this burden.

In this regard, the court is impressed by the testimony of the stockholders personally. As stated, they are well-educated highly intelligent competent people.

5. In the April 1, 1967, resolution, "specific" reserves were also set up for professional salaries (already considered by the court as a proper part of operating reserve throughout the period) and a bonus fund of $150,000. In regard to the latter, the court is of the view that a bonus fund is not a reasonable need of a prudent businessman. Traditionally, bonuses are only paid, or expected in profitable years and are normally paid out of current profits. It appears imprudent for a company to continue to pay bonuses out of earned surplus, if, in fact, current business is not profitable. Similarly, it is felt that even key employees could not reasonably anticipate such payments and that failure to pay bonuses in a bad year is not a real hazard or risk to this company. For that reason, it is rejected.
There was also argument made to the effect that the company could reasonably accumulate the sum of $30,000 to cover the deductible portion of its "errors and omissions" liability insurance. Similarly,

the court believes such exposure is more normally charged to current operations in the year of such loss, if any. This is not to say that some such reserve could not legally be made if the profit picture was weak for successive years. In any event, however, there is insufficient delineation of this need to meet the test here.

6. Which provides:
"EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) *Unreasonable accumulation determinative of purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

7. United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969).

However, they are definitely the "engineer" type in that their intellectual interest lies primarily in the creation and execution of projects, rather than finance and management. On the whole, they demonstrate a very low level of sophistication in such areas and a general unfamiliarity with securities. During the years in question, they were all working so hard and so long on the new business that long range planning, either personal or corporate, simply was neglected for most of the period. From the annual discussion of dividends, they were aware that the worth of the business was increasing and hence their investment. However, few, if any, had any knowledge of the desirability of capital gains over ordinary income. Moreover, at such time they had no knowledgeable tax accounts or tax counsel, who arrived on the scene in 1968, but merely used a bookkeeping firm which prepared the necessary tax forms. During the period, all were on comparatively moderate salaries and most with growing children. Their personal need for extra income was strong. An examination of the individual tax returns shows an almost total lack of other investments or other income besides salaries and dividends from Eastern.

■ Each of the stockholders has testified that tax avoidance was no part of their motivation at the time. From observation of the witnesses and considering their backgrounds and personal circumstances, the court finds such testimony altogether credible. If believable, such evidence should be given serious consideration. E. G. Schenuit Rubber Company v. United States, 293 F.Supp. 280 (D.Md.1968); Inland Oil & Chemical Corp. v. United States, 338 F.Supp. 1330 (D.Md.1972). In the court's view, this group had been through the difficult years together and simply wanted to place the company on a sound liquid basis so they wouldn't have to bother with financial problems in carrying out their technical duties. There is a strong feeling that they did not appreciate the extent of the earnings at the time and cer-

tainly not the tax consequences of their accumulation.

■ Objectively, such testimony is buttressed from several directions. First of all, none was in a high personal tax bracket, the highest rate for the highest paid being less than 40% and most in the 24%–32% brackets. While high tax brackets are not controlling on the issue of intent, their presence is a compelling consideration to support tax avoidance as a motive. E. g. Battelstein Investment Company v. United States, 302 F.Supp. 320 (S.D.Tex.1969), aff'd 442 F.2d 87 (5th Cir. 1971). See also Shaw-Walker Company v. C. I. R., 390 F.2d 205 (8th Cir. 1968), vacated and remanded 393 U.S. 478, 89 S.Ct. 707, 21 L.Ed.2d 687 (1968). Conversely, a low personal tax-bracket belies its existence. While there are personal tax savings in any accumulation, the difference in the savings here and eventual capital gains tax is meager. In the subsequent purchase by Simons, considerable stock was sold on such basis. This case is a far cry from those sole or family-owned corporations in which nominal salaries and no dividends are paid while the corporate value builds up for future generations.

Also significant are the regulatory tests set up by the Commissioner. Sec. 1.537–2(a)(c) (29 CFR) provides:

"GROUNDS FOR ACCUMULATION OF EARNINGS AND PROFITS.

(a) *In general.* Whether a particular ground or grounds for the accumulation of earnings and profits indicate that the earnings and profits have been accumulated for the reasonable needs of the business or beyond such needs is dependent upon the particular circumstances of the case. Listed below in paragraphs (b) and (c) of this section are some of the grounds which may be used as guides under ordinary circumstances.

"(c) *Unreasonable accumulations of earnings and profits.*—Although the following purposes are not exclusive, accumulations of earnings and profits

to meet any one of such objectives may indicate that the earnings and profits of a corporation are being accumulated beyond the reasonable needs of the business:

(1) Loans to shareholders, or the expenditure of funds of the corporation for the personal benefit of the shareholders;

(2) Loans having no reasonable relation to the conduct of the business made to relatives, or friends, of shareholders or to other persons;

(3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations;

(4) Investments in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation; or

(5) Retention of earnings and profits to provide against unrealistic hazards."

 Thus, the typical indicia of intentional excess accumulation are almost totally lacking in this case [8] and their absence is persuasive. The court finds no indication that any of the accumulation was used, either directly or indirectly, for the benefit of any shareholder or shareholder-related venture. This likewise is an objective circumstance to negate personal motivation on their part.

 It would be hazardous to determine the question of intent on the unsupported subjective testimony of directors alone. However, where that testimony is corroborated by such objective considerations, the court believes that the sum total is a sound basis for decision. Indeed, it is difficult to envision any other manner in which a taxpayer

could meet the burden of the preponderance of the evidence and thus gain the defense authorized by the Congress in Sec. 533. There simply would not ordinarily be any documentary evidence to negate intent. Hence, as instinctive to all triers of fact, subjective evidence must necessarily be objectively tested by extraneous circumstances which indicate its true worth. Hence, the court finds considerable support to its sincerity and nothing to the contrary. Thus, on the basis of all the evidence, both direct and circumstantial, the court finds that plaintiff has effectively met the burden of disproving any unacceptable motive in the excess accumulation for the years in question. (Question 2).

It follows that judgment must issue in favor of the taxpayer and against the government for the principal sums involved plus interest and costs according to law. Counsel are directed to furnish the proper figures to the Clerk forthwith.

This memorandum opinion shall constitute findings of fact and conclusions of law under Rule 52.

It is so ordered.

---

8. The 1967 land purchase of $42,500 appears to be for investment purposes. However, the relation of this sum to the total accumulation is minimal and, therefore, insignificant.