MYRON'S BALLROOM, a corporation,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

MYRON'S ENTERPRISES, a corporation,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Nos. 72–2842–AAH, 72–2843–AAH.

United States District Court,
C. D. California.

Aug. 28, 1974.

Flint & MacKay, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Los Angeles, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW (REFUND OF INCOME TAXES TO MYRON'S BALLROOM RESTAURANT AND COCKTAIL BAR BUSINESS)

HAUK, District Judge.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and Rule 7 of the Rules of the Central District of California, the Court makes the following findings of fact and conclusions of law after trial upon the facts without a jury.

### FINDINGS OF FACT

1. This is an action for refund of Federal Income Taxes paid by the plaintiffs for the fiscal years ending September 30, 1966, 1967 and 1968.

2. Plaintiffs, Myron's Ballroom (Ballroom) and Myron's Enterprises (Enterprises) are each corporations which were incorporated in the State of California on the respective dates of August 31, 1955, and December 31, 1957.

3. The business function of Ballroom is the operation of a restaurant and cocktail bar business. The business function of Enterprises is the operation of a ballroom for amusement, entertainment and diversification to the public. The principal place of business of both Ballroom and Enterprises is located at 1024 South Grand Avenue in Los Angeles, California. Mrs. Myrna Myron is the sole shareholder of both Ballroom and Enterprises since their incorporation and through the years at issue.

4. The officers of Ballroom and Enterprises were the same and are set forth as follows for each of the years in issue:

a. President—Mrs. Myrna Myron

b. Vice President—George G. Gillett (1955–1968)

c. Vice President—Robert H. McKnight (1968)

d. Secretary-Treasurer—James Myron.

5. The members of the Board of Directors of Ballroom and Enterprises were the same and consisted of the three officers heretofore mentioned. Mrs. Myron acted as the chairman of the Board of Directors of each corporation.

6. For each of the fiscal years at issue, both Ballroom and Enterprises timely filed corporate income tax returns and remitted the taxes shown due on the returns.

7. Subsequent to the filing of the corporate income tax returns by Ballroom and Enterprises, an audit of said returns was performed by the District Director of Internal Revenue Service in Los Angeles, California, which resulted in certain adjustments, not at issue here, and assertion of the accumulated earnings tax and interest thereon from the date of filing the corporate income tax returns as follows:

| Ballroom: | 1966 | 1967 | 1968 |
|---|---|---|---|
| Accumulated earnings tax | $6,725.71 | $ 9,651.08 | $6,326.71 |
| Interest | 2,017.71 | 2,316.26 | 1,138.81 |
| | $8,743.42 | $11,967.34 | $7,465.52 |

| Enterprises: | 1966 | 1967 | 1968 |
|---|---|---|---|
| Accumulated earnings tax | $ 8,386.04 | $ 9,752.20 | $6,245.95 |
| Interest | 2,515.81 | 2,340.52 | 1,124.27 |
| | $10,901.85 | $12,092.72 | $7,370.22 |

8. On December 27, 1971, Ballroom and Enterprises paid in full the assessments as set forth in Paragraph 7. On May 24, 1972, Ballroom and Enterprises

each duly filed claims for refund of the taxes and interest paid.

9. On November 28, 1972, Ballroom and Enterprises filed complaints for income tax refunds for the amounts paid in respect to the accumulated earnings tax and the interest thereon.

10. Ballroom and Enterprises each maintain its books and records and reports its income and expenses on the accrual basis of accounting. Neither Ballroom nor Enterprises ever declared or paid a dividend.

11. Mrs. Myron has been involved in the dancing business all of her life. In her early years, she taught at dance schools and later toured the country with her husband as a dancing team. In 1940, she and her husband opened a dancing school known as Myron's Dance Studio, located on Wilshire Boulevard in Los Angeles, California. In 1947, the Myrons leased and operated a ballroom then known as the Grand Ballroom, an old established ballroom located at 1024 South Grand Avenue in Los Angeles. The name was later changed to Myron's Ballroom.

12. Approximately one year after operating Myron's Ballroom, the Myron's purchased another long established ballroom known as the Goldberg Ballroom. They paid $75,000 for the Goldberg Ballroom. The name of the Goldberg Ballroom was later changed to the Colonial Ballroom. Both the Myron's Ballroom and the Colonial Ballroom were operated equally by the Myrons up until the time of their divorce in 1950. After the divorce, Mrs. Myron became the sole owner and proprietor of the Colonial Ballroom. Mr. Myron continued to lease and operate the Myron's Ballroom.

13. In 1951, Mr. Myron's lease on the Grand Ballroom was terminated. The property owners' representative, a Mr. Alexander, approached Mrs. Myron and offered to lease the property to her. Mrs. Myron soon thereafter took over its operation.

14. On August 31, 1955, the corporation known as Myron's Ballroom was formed and assumed the lease obligations and operation of the ballroom. Later that same year, Mrs. Myron was approached by owners of a cocktail bar business who desired to move their business to the Myron's Ballroom.

15. Mrs. Myron and the cocktail bar owners entered into a percentage arrangement with the owners operating the cocktail bar business in the Myron's Ballroom. On December 31, 1957, the corporation known as Myron's Enterprises was formed and took over the entire cocktail bar business after the owners determined to terminate the operation.

16. At the time the bar owners transferred the liquor license, a mistake was made, and the license was actually transferred to Myron's Ballroom rather than to Myron's Enterprises, the corporation which had been formed to operate the cocktail bar business. When the mistake was discovered, Mrs. Myron did not believe the error was significant enough to correct. From 1958 to the present time, the corporation known as Myron's Ballroom has operated the cocktail business, and the corporation known as Myron's Enterprises has operated the ballroom.

17. When Mrs. Myron took over operation of the Myron's Ballroom in 1955, a 5-year lease was negotiated for the period 1955–1960. Business greatly improved after the cocktail bar business was moved to the ballroom and Mrs. Myron negotiated an amendment to the lease providing for an option to renew the lease for an additional 5-year period, to 1965. The owner of the ballroom real property was an elderly woman named Pearl Rose. Her brother-in-law, a Mr. Alexander, managed all of Pearl Rose's rental properties.

18. Between 1957 and 1960, Mrs. Myron spoke occasionally with Mr. Alexander and expressed her desire to acquire the Myron's Ballroom property. The ballroom had been constructed in the early 1900's and was badly in need of major plumbing and electrical repairs. Also, the building had never been

painted. As business was good, and Mrs. Myron was determined to continue with the Myron's Ballroom, she desired that the two corporations acquire the property before expending funds for the major repairs.

19. In late 1959 or early 1960, Mrs. Myron met with Pearl Rose and offered her $100,000 for the ballroom property. Pearl Rose declined to sell at that time and told Mrs. Myron she would speak with her later concerning the matter. In regard to the immediate plumbing, electrical and painting needs of the building, the work was done and the corporations paid approximately one-half of those costs.

20. In approximately 1961 or 1962, Mrs. Myron met with Pearl Rose and offered her up to $150,000 for the property. In each of the meetings concerning purchase of the property, Pearl Rose declined to sell and told Mrs. Myron she would discuss it with her when she was ready to sell. Pearl Rose also stated that at the time she was ready to sell, she would give Mrs. Myron and her corporations "first choice".

21. In 1963, Mrs. Myron learned that Russ Morgan, a former orchestra leader at the ballroom, had offered Pearl Rose $300,000 cash for the Myron's Ballroom property. During 1963, Russ Morgan had also spoken to Mrs. Myron concerning his desire to purchase the ballroom business and remaining lease term.

22. In 1963, Mrs. Myron was not interested in selling the ballroom business and became concerned as she realized that the Myron's Ballroom business could be acquired by anyone purchasing the real property from Pearl Rose.

23. In the latter part of 1964, Mr. Robert H. McKnight was employed as the accountant for Myron's Ballroom and Myron's Enterprises. In 1968, Mr. McKnight also became Vice President of both of the corporations.

24. As the accountant for each of the corporations, Mr. McKnight's duties included posting the general ledgers, preparation of quarterly financial statements and preparation of employment and income tax returns. Mr. McKnight also rendered financial and tax advice to the corporations. Mr. McKnight was a licensed Public Accountant since 1948; he maintained his office in Encino, California, where he serviced approximately twenty other small business clients.

25. After Mr. McKnight became employed by the corporations, he noticed from the records of the corporations that a substantial amount of cash was being accumulated. He then asked Mrs. Myron the purpose for the accumulations. Mrs. Myron then told Mr. McKnight that the corporations planned to purchase the ballroom property for $300,000 cash.

26. Shortly after the conversation between Mr. McKnight and Mrs. Myron regarding the cash accumulations and the planned purchase of the ballroom property, Mr. McKnight read a series of weekly articles concerning the accumulated earnings tax. The articles were published by Prentice-Hall.

27. After reading the weekly articles concerning the accumulated earnings tax, Mr. McKnight advised Mrs. Myron that to avoid the possibility of a tax problem, the minutes of the corporation should indicate the planned purchase of the ballroom property. Mrs. Myron agreed and Mr. McKnight, whose duty it was to also prepare the corporate minutes, prepared minutes for Myron's Ballroom after a meeting on August 1, 1964, said minutes contained the following paragraph:

"4. FURTHERED RESOLVED: That earned surplus be retained to build up the cash reserve with intention of buying property which corporation is presently leasing at 1024 South Grand Avenue, Los Angeles, California. Owner of property will consider a cash sale only which makes the buildup of a cash reserve further necessary."

28. Mr. McKnight also prepared similar minutes indicating the planned purchase after meetings of the directors of

Myron's Ballroom on May 26, 1965, February 21, 1966, and June 30, 1966.

29. Mr. McKnight also prepared minutes indicating the planned purchase after meetings of the directors of Myron's Enterprises on June 30, 1966.

30. In preparing the two corporations' income tax returns for the fiscal year ended September 30, 1968, Mr. McKnight attached the following notes to said returns at the time they were filed with the District Director.

"Note: Retained earnings are to be used for purchase of building. Taxpayer has commitment in writing giving them first option on purchase of building located at 1024 South Grand Avenue, Los Angeles, California on condition that the sale will be all cash. Tentative price is $300,000. Taxpayer is now lessee of the building."

31. In October 1970, the option date to renew the lease for a 5-year period (which option was entered into on February 8, 1965, and exercised on December 2, 1966) was approaching and Mrs. Myron met again with Pearl Rose and offered $300,000 cash for the ballroom property. Pearl Rose again declined to sell. She told Mr. Myron that she was not then ready to sell the ballroom property.

32. On August 5, 1970, Myron's Ballroom and Mryon's Enterprises purchased the Paragon Ballroom located in Monterey Park, California. The purchase price was $100,000 in cash and was paid one-half by each of the corporations. In the following two years, approximately between $30,000–$35,000 in improvements and repairs were made to Paragon Ballroom property. In acquiring this ballroom, it was Mrs. Myron's intention to continue with the old line patronage of the Myron's Ballroom and attempt to establish a younger patronage for ballroom dancing at the Paragon Ballroom. The Paragon Ballroom proved to be a failure, large operating losses were incurred, and in 1973, the property was sold.

33. During the years 1966, 1967 and 1968, Myron's Ballroom and Myron's Enterprises each required a reasonable amount of working capital to carry on their respective business operations.

34. During the years in issue, Mr. McKnight and Mrs. Myron periodically discussed the finances of the two corporations and their respective working capital needs. As the cash position of each of the corporations was well in excess of the required working capital needs, formal budgets or cash flow statements were not prepared by Mr. McKnight.

35. During the years 1966, 1967 and 1968, Myron's Ballroom maintained an average constant liquor inventory of $6,000. Federal income taxes were estimated to be $13,000 annually. An amount equal to approximately three months of recurring business expenses, including compensation of officers, salaries and wages, rent, payroll taxes, licenses and permits, advertising and promotion, insurance, pension plan, supplies and miscellaneous expenses, was estimated by Mr. McKnight to be $21,000 which he believed was needed in the conduct of the business, and the amount that a reasonably prudent businessman would believe would be appropriate as a cash reserve for those reasonably foreseeable business expenses and financial obligations of the corporation. It was Mr. McKnight's opinion, and he so advised Mrs. Myron, that the working capital needs of Myron's Ballroom was $40,000.

36. During the years 1966, 1967 and 1968, Myron's Enterprises had, in addition to other obligations, employment contracts for six month periods of time with the musicians which played at the ballroom. Federal income taxes were estimated to be $15,000 annually. An amount equal to approximately three months of business expenses, including amounts payable to musicians and musicians' union; compensation of officers, salaries and wages, rent, payroll taxes, licenses and permits, advertising and promotion, insurance, pension plan, sup-

plies and miscellaneous expenses, was estimated by Mr. McKnight to be $45,000 which he believed was needed in the conduct of the business, and the amount that a reasonably prudent businessman would believe would be appropriate as a cash reserve for those reasonably foreseeable business expenses and financial obligations of the corporation. It was Mr. McKnight's opinion, and he had so advised Mrs. Myron, that the working capital needs of Myron's Enterprises was approximately $60,000.

37. Prior to 1966, Mrs. Myron obtained bids and estimates of the cost for needed improvements and repairs that were required at the time of purchasing the ballroom property from Pearl Rose.

38. The total cost of the planned improvements and repairs to the ballroom property was $75,000 and included installation of air conditioning, replacement of carpets, painting inside and out, plumbing repairs and replacements, electrical repairs and replacements, and installation of a sprinkler system.

39. During the years in issue, the corporations' combined net income after taxes and retained earnings are set forth in the following amounts as reflected in their income tax returns:

| Fiscal years ending September 30, | 1966 | 1967 | 1968 |
|---|---|---|---|
| Net Income: | | | |
| Ballroom | $24,157.11 | $28,160.27 | $24,442.43 |
| Enterprises | 30,194.68 | 28,305.21 | 24,374.61 |
| Total | $54,351.79 | $56,465.48 | $48,817.04 |
| Retained earnings: | | | |
| Ballroom | $166,161.68 | $197,958.40 | $218,820.15 |
| Enterprises | 149,868.82 | 176,357.25 | 196,945.63 |
| Total | $316,030.50 | $374,315.65 | $415,765.78 |

40. Mrs. Myron expected at any time during the years 1966, 1967 and 1968 that Myron's Ballroom and Myron's Enterprises would be able to purchase the ballroom property from Pearl Rose for a price of $300,000 cash, no less than that amount, and maybe more.

41. At the time of purchasing the ballroom, the total cash requirement for the two corporations combined would have been $475,000 which included working capital, improvements and repairs, and the cost of the ballroom property.

42. During the years 1966, 1967 and 1968, Mrs. Myron had approximately $400,000 in cash deposits in savings and loans and in banks. Mrs. Myron testified that if at the time of purchase of the property the corporations did not have sufficient funds, she would be willing to loan up to $200,000 of her own cash to the corporations for the purchase of the ballroom property and to put it into decent condition.

43. On September 28, 1967, Ballroom and Enterprises entered into a Joint Retirement Income Plan (Plan), effective as of September 30, 1967. Ballroom made payments to the Plan in the amount of $6,546.30 on each of the dates November 22, 1967, and November 22, 1968. Enterprises made payments to the Plan in the amount of $6,546.30 on each of the dates October 1, 1967 and November 22, 1968.

44. The provisions of the Plan provided for 100% vesting upon termination of employment. Accordingly, contributions made into the Plan on behalf of participants were nonforfeitable.

45. Any conclusion of law deemed to be a finding of fact is hereby found as a fact.

## CONCLUSIONS OF LAW

1. During the years in issue, the acquisition of the ballroom property and the planned improvements and repairs were reasonably anticipated business needs of Myron's Ballroom and Myron's Enterprises, and said needs were directly connected with the businesses of the corporations. Treasury Regulations on Income Tax, Section 1.537–1(a) (26 C. F.R.).

2. During the years in issue, the corporations had specific, definite and feasible plans to acquire the ballroom property. The expectation that the ballroom property would be acquired at any time during the years in issue was a reasonable expectation. Regulations on Income Tax, Section 1.537–1(b)(1) (26 C.F.R.).

3. For the years 1966, 1967 and 1968, the business operation of both Myron's Ballroom and Myron's Enterprises consisted of a "service type" business, not manufacturing with raw materials, inventories or receivables. Accordingly, the manufacturing formula for one "operating cycle", as described in Bardahl Mfg. Corp. v. Commissioner, 24 T.C.M. 1030 (1965) is inappropriate to determine the working capital needs of Myron's Ballroom and Myron's Enterprises. See Simons-Eastern Company v. United States, 354 F.Supp. 1003 (1972).

4. The working capital needs of Myron's Ballroom and Myron's Enterprises should be determined by an examination of the particular needs of each of the corporations. Neither the tax payer nor the government is bound by the rigidity of the mathematical precision of *Bardahl* nor of a set period. Simons-Eastern Company v. United States, supra.

5. Considering the particular business' needs of Myron's Ballroom, a reasonable amount of working capital would be $40,000 during the years in issue.

6. Considering the particular business' needs of Myron's Enterprises, a reasonable amount of working capital would be $60,000 during the years in issue.

7. Considering the reasonably anticipated business need of the corporations to purchase the ballroom property, for a sum of at least $300,000 and then expend approximately $75,000 in needed repairs and improvements, the corporations combined required at least $375,000, in addition to their combined working capital needs of $100,000.

8. Of the total sum of $375,000 required by the corporations to purchase, repair and improve the ballroom property, Mrs. Myron stated she would loan up to $200,000 to the corporations for those purposes if the corporations did not have sufficient funds to consummate the transactions.

9. Accordingly, a reasonable accumulation for the corporations combined, for the purposes of acquisition, repair and improvement of the ballroom property, would be $250,000, with Mrs. Myron loaning the balance of funds required by the corporations.

10. For the fiscal year ending September 30, 1966, Myron's Ballroom and Myron's Enterprises had a combined accumulated surplus of $216,030.50, after working capital of $100,000, and, together with the personal assets of Mrs. Myron in the amount that she indicated she would loan to the corporations, the accumulations of Myron's Ballroom and Myron's Enterprises were both reasonable and did not exceed what a reasonably prudent businessman would consider to be the needs, present and anticipated needs, for the business purposes of the two corporations. Regulations on Income Tax, Section 1.537–1(b)(1).

11. For the fiscal year ending September 30, 1967, Myron's Ballroom and Myron's Enterprises had a combined accumulated surplus of $274,315.65, after working capital of $100,000, and, together with the personal assets of Mrs. Myron in the amount that she indicated she would loan to the corporations, the combined accumulations of the corpora-

tions were reasonable to the extent of $250,000. Accordingly, as the combined accumulations for the purposes indicated was $274,315.65, the combined difference of $24,315.65 should be taxed as an unreasonable accumulation.

12. The accumulated earnings tax is applicable to $12,157.83 of the income of Myron's Ballroom for its fiscal year ending September 30, 1967.

13. The accumulated earnings tax is applicable to $12,157.82 of the income of Myron's Enterprises for its fiscal year ending September 30, 1967.

■ 14. For the fiscal year ending September 30, 1968, Myron's Ballroom and Myron's Enterprises had a combined accumulated surplus of $315,765.78, after working capital of $100,000, and, together with the personal assets of Mrs. Myron in the amount that she indicated she would loan to the corporations, the combined accumulations of the corporations were reasonable to the extent of $250,000. Accordingly, as the combined accumulations for the purposes indicated exceeded $250,000 by $65,765.78, and the combined income after taxes of the two corporations amounted to only $48,817.-04, the entire net income of both corporations is subject to the accumulated earnings tax.

15. The accumulated earnings tax is applicable to $24,442.43 of the income of Myron's Ballroom for its fiscal year ending September 30, 1968.

16. The accumulated earnings tax is applicable to $24,374.61 of the income of Myron's Enterprises for its fiscal year ending September 30, 1968.

■ 17. According to the testimony of Mrs. Myron and Mr. McKnight, in 1965, Mr. McKnight discussed with Mrs. Myron the possibility of a tax problem because of the corporations' cash accumulations. To avoid the possibility of tax problems, Mr. McKnight suggested that Mrs. Myron place in the corporate minutes certain resolutions indicating the planned purchase of the ballroom property. Mr. McKnight prepared the minutes of the corporations accordingly so as to avoid any tax or tax problems in respect to the accumulations. The discussions between Mrs. Myron and Mr. McKnight in respect to possible tax problems, and the placing of the aforementioned resolutions in the corporate minutes being done to avoid the tax, there was a tax avoidance motive within the meaning of the statute for the years 1966, 1967 and 1968. Sections 531 and 532 of the Internal Revenue Code of 1954, (26 U.S.C.); United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969).

■ 18. The entire amount of interest paid by the corporations in respect to the asserted accumulated earnings taxes for the years in issue shall be refunded to the corporations, as interest is not applicable to an assessable penalty, additional amount, or addition to tax within the meaning of Section 6601(f)(2) of the Internal Revenue Code of 1954 (26 U.S.C.). Bardahl Mfg. Corp. v. United States, 452 F.2d 604 (9th Cir., 1971).

19. The operational aspect of the Plan was discriminatory during each of the years in issue.

The payment into the Plan in the amount of $6,546.30 by each corporation on November 22, 1967, is properly deductible by said corporation as additional compensation to Mrs. Myron for each corporation's fiscal year ending September 30, 1968. Treasury Regulations on Income Tax, Section 1.404(a)–12; (26 C.F.R.) Internal Revenue Code of 1954, Section 404(a)(5) (26 U.S.C.).

20. Any finding of fact deemed to be a conclusion of law is hereby concluded as a matter of law.

Let judgment be entered accordingly.