T.C. Memo. 1996-238


UNITED STATES TAX COURT


EYEFULL INCORPORATED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3893-94.                    Filed May 22, 1996.


1.    Over several years M performed substantial
      services without compensation for P, a
      domestic corporation that M owned indirectly
      through two tiers of foreign entities.  There
      was no written agreement for the services and
      no contemporaneous record of an obligation to
      pay for them.  When P made a payment to M and
      deducted it as compensation for the prior
      services, R recharacterized the payment as a
      dividend.  <u>Held</u>:  The payment is deductible
      as compensation, because remuneration was
      consistent with the expectation of the
      parties at the time the services were
      performed.

2.    P accumulated earnings without specific,
      definite and feasible plans to use the
      accumulations and lent substantial amounts to
      affiliates for purposes unrelated to its

business.  Held, further, P is liable for the accumulated earnings tax.

Robert E. Miller and Edith S. Thomas, for petitioner.

Alexandra E. Nicholaides and Eric R. Skinner, for respondent.


MEMORANDUM OPINION


LARO, Judge:  Petitioner sought redetermination of deficiencies in Federal income taxes, additions to tax, and penalties determined by respondent as follows:

| Taxable Year Ended August 31 | Deficiency | Additions to Tax Sec. 6651(a)(1) | Sec. 6653(a) | Penalty Sec. 6662 |
|---|---|---|---|---|
| 1989 | $124,721 | $1,192 | $11,396 | --- |
| 1990 | 208,903 | 1,487 | --- | $1,189 |
| 1991 | 216,364 | 36,336 | --- | 29,069 |
| 1992 | 16,706 | --- | --- | --- |

After concessions by both parties, the issues for decision are:[1] (1) Whether petitioner may deduct payments made to one of its ultimate beneficial owners as compensation for services. We hold that it may. (2) Whether petitioner is liable for accumulated earnings tax.  We hold that it is liable with respect to 3 of the 4 taxable years at issue.  (3) Whether petitioner is liable for additions to tax under sections 6651 and 6653(a) and for

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

accuracy-related penalties for negligence under section 6662. We hold that it is liable. Some of the facts have been stipulated and are so found. The stipulation of facts and joint exhibits attached thereto are incorporated herein by this reference.

Issue 1:  Compensation

### Background

Petitioner was incorporated under California law in 1984. At the time the petition was filed, petitioner's principal place of business was in the city of Ontario, in San Bernardino County, California. Petitioner owns and operates an adult entertainment complex comprising a nightclub, bookstore, video arcade, and live peep show. Petitioner is one of a large group of corporations in the same industry (the Mohney Group) that are owned, directly or indirectly, by Harry V. Mohney (Mohney), either alone or as one of several beneficiaries of a trust. During the years at issue, petitioner's stock was owned in equal shares by three Turks & Caicos Islands holding companies, Fun Films Ltd., Tornado Trading Inc., and Azid Trading Corp. Each of these holding companies was, in turn, wholly owned by the Amaranta Trust, a foreign trust established by Mohney. During the years at issue the trustee of the Amaranta Trust was Andrew Newlands (Newlands) and the beneficiaries were Mohney and members of his family. Under the terms of the trust instrument Mohney had no control over trust assets and no power to discharge the trustee or appoint his successor in the event that he retired.

Mohney served as an officer of several corporations in the Mohney Group. Many others, including petitioner, retained him as a "consultant". Pursuant to a general understanding with Newlands, in his capacity as a "consultant" Mohney actually exercised the highest executive authority with respect to each of the corporations. Although he was ultimately accountable to the trustee, he understood that he had Newlands complete confidence and managed the companies effectively without supervision. Mohney submitted no written report of his work to Newlands but informed him of the progress of the companies under his control from time to time.

On his individual income tax returns, Forms 1040, Schedule C, for each of the years 1985 through 1991, Mohney reported his principal business or profession as consulting and included payments he received from corporations in the Mohney Group in his gross receipts for the taxable year. The amounts reported as consultation income from the Mohney Group for each year are as follows:

| Year | Number of Companies | Total |
|------|---------------------|-------|
| 1985 | 2 | [1]$10,894 |
| 1986 | 2 | 36,823 |
| 1987 | 3 | [2]68,389 |
| 1988 | 4 | 175,917 |
| 1989 | 2 | 100,863 |
| 1990 | 12 | 364,448 |
| 1991 | 49 | 2,706,827 |

[1]This figure comes from a schedule prepared by petitioner. Mohney's return shows a total of $30,408, which may include receipts from sources outside the Mohney Group.

²This figure comes from a schedule prepared by petitioner. Mohney's return shows the amount received from only one of the three, $59,702.  The discrepancy was not explained.

Under his usual "consulting" arrangement, the amount and timing of payments Mohney received were not fixed in advance, but varied based on his assessment of the company's performance and its needs.

Mohney's "consulting" relationship with petitioner conformed to the general pattern.  From the founding of the company through the taxable years at issue, Mohney exercised the highest executive responsibilities and actively participated in making and implementing major corporate decisions.  In petitioner's early years of operation he designed the floor plan for the complex, negotiated the purchase of the building site, oversaw construction of the building, and procured merchandise and credit.  In 1988 he hired Jacqueline Hagerman (Hagerman) to serve as petitioner's president, and the determination of her annual salary was his responsibility.  During the years at issue he was consulted on a regular basis by Hagerman and the other management concerning administration, operations, promotions, advertising, and the myriad legal problems that arose in regard to zoning, building code compliance, and restrictive ordinances.

Hagerman moved to Michigan in 1990 and Donald Krontz (Krontz) was hired as manager to supervise daily operations in her absence.  It was these two with whom Mohney regularly worked. Both understood that there was a preexisting consulting agreement

between him and petitioner or the shareholders. Their understanding was based on what they had been told, by Mohney himself and perhaps others, and it was confirmed by his availability 24 hours a day to participate in decisions on any corporate matter of importance that arose. Neither had ever seen documentation of a consulting relationship, and none existed. There is no written consulting agreement between petitioner and Mohney relating to any period between 1985 and 1992. Petitioner has no timesheets, statements or bills detailing the dates, hours, or specific times for which compensation was payable to Mohney. Petitioner did not accrue a liability for consulting fees on its books at the time Mohney rendered services.

Beginning in or around 1991, petitioner engaged the services of Deja Vu, Inc. (Deja Vu). This company provides management consulting for nightclubs. At all relevant times its president was Krontz and Mohney was one of its salaried employees. Mohney performed some services for petitioner in this capacity. While it is clear that petitioner paid Deja Vu for its consulting work, it is not clear how much of the work was performed by Mohney or how much Deja Vu was paid for Mohney's work. Mohney reported wages from Deja Vu of $252,000 in 1990 and $261,000 in 1991.

It was Mohney's original understanding from discussions with Newlands that eventually he would receive 10 percent of petitioner's gross receipts. Petitioner made no payments to him during 1985 through 1987. In 1988 Mohney caused petitioner to

pay him $30,000.  Mohney believed that payment of more than this amount would have been unwise at a time when the company's viability was uncertain.  The next payment occurred in July 1991. The amount and form had been decided at some time during the previous year by agreement between Mohney and Newlands.  In November 1990 Mohney discussed the accounting aspects of the transaction with David Shindel (Shindel), an independent certified public accountant who had been retained to oversee tax compliance for several companies within the Mohney Group. Hagerman, petitioner's president and sole member of the board of directors, had no part in the decision.  Newlands, acting as representative of petitioner's shareholders, notified her that petitioner was to transfer to Mohney $274,980 worth of precious metals--Krugerrands and the like--that it had recently acquired on Mohney's instructions; the remaining $65,000 of precious metals was to be distributed to the shareholders.  An attorney close to Mohney drafted a resolution of petitioner's board of directors authorizing the payment.  The resolution acknowledged that petitioner had "availed itself of the expertise, consulting services and advisory assistance of HARRY V. MOHNEY * * * in connection with the operation of this Corporation's retail business since 1985 * * * pursuant to and in accordance with agreements reached between said HARRY V. MOHNEY and an authorized representative of the shareholders."  It stated that the conveyance of precious metals was "in full and final

satisfication of any amounts due him for consulting and advisory services," and that "the amount has been acknowledged by the authorized representative of the shareholders to be consistent with the agreements and understandings previously made and entered into." Hagerman approved the resolution on July 30, 1991. The payment represented 3.3 percent of petitioner's cumulative gross receipts since 1985.

Mohney received a Form 1099 reflecting the payment and included it in income for 1991 as gross receipts from his consulting business. Petitioner deducted the payment in computing its taxable income for the taxable year ended August 31, 1991 (TYE 8/31/91). In her notice of deficiency respondent disallowed the full deduction.

### Discussion

The first issue raised by petitioner's payment to Mohney of $274,980 in TYE 8/31/91 is whether it may be deducted as compensation. If so, we must decide for what taxable year(s) it is deductible. Section 162(a)(1) provides that deductible business expenses include a reasonable allowance for salaries or other compensation for personal services actually rendered. In general the deductibility of a payment characterized as compensation turns on two requirements: The payment must be purely for services, and it must be reasonable in amount. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th Cir. 1983), revg. T.C. Memo. 1980-282; sec. 1.162-7(a), Income

Tax Regs. The focus of the controversy in this case is the former requirement.[2] It is well established that a payment may be deducted as compensation only to the extent that it was actually intended as such. Jefferson Block & Supply Co. v. Commissioner, 59 T.C. 625, 633-634 (1973), affd. without published opinion 492 F.2d 1243 (6th Cir. 1974); Paula Constr. Co. v. Commissioner, 58 T.C. 1055 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). Respondent takes the position that compensation for prior services was not the purpose of the payment to Mohney, because (1) the services had not been rendered with a view toward compensation; (2) to the extent the services may have been rendered for compensation they were otherwise fully compensated; and (3) the circumstances of the payment indicate a purpose other than compensation. In respondent's view, the payment was in substance a nondeductible dividend disguised as compensation for prior services and its principal motivation was to avoid liability for the accumulated earnings tax. We disagree.

---

[2] We do not understand respondent to challenge the reasonableness of the payment in relation to the services performed. In the notice of deficiency there was no indication that this was a reason for disallowing the deduction, and respondent presented no argument on this issue at trial or on brief.

Respondent acknowledges that Mohney performed substantial services for petitioner on a regular basis:

> Mr. Mohney had considerable involvement in every facet of the operation of petitioner. He made virtually every kind of decision needed to operate the petitioner from hiring employees, and making decisions on building, remodeling, and sign design, to financial and investment decisions and lending to related parties.

She concludes: "Mr. Mohney's involvement is tantamount to that of an owner, someone who has financial stake in the petitioner, rather than that of a consultant."  Thus, respondent believes that Mohney performed these services not for compensation, but for a return on his investment in petitioner.

We agree with respondent that, by themselves, Mohney's extensive activities on petitioner's behalf do not establish the existence between them of a business relationship consistent with the payment of compensation.  See Paula Constr. Co. v. Commissioner, supra at 1058; cf. Whipple v. Commissioner, 373 U.S. 193, 202-203 (1963).  There must also be evidence that at the time the services were rendered the parties understood them to be part of a business transaction conducted for profit. Respondent's disguised dividend theory relies heavily on the absence of a written consulting agreement, timesheets, invoices, bills, work reports, accrued liabilities on petitioner's books or other contemporaneous documentation of a consulting relationship.

We do not find the absence of such documentation to be dispositive. The fact that petitioner's books do not reflect the accrual of a liability at the time services were rendered is not necessarily inconsistent with an understanding that the company was obligated to pay for the services. The amount and timing of the payment were understood to be contingent on business performance over an indefinite period. To have made a reasonable estimate of the accrued expense for Mohney's compensation in the company's accounts would have been extremely difficult under these circumstances. Assuming that a business relationship did exist between petitioner and Mohney, plainly it would not have been conducted at arm's length, and therefore, in general, documentation of the kind sought by respondent would have served little, if any, useful function. Where the owner of a closely held corporation takes an active part in managing its business, neglect of formal documentation of the compensation arrangement between them is not uncommon. In recognition of this fact, our cases have not required formal documentation as a condition for deductibility of executive compensation in the context of a closely held corporation. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 713-714 (1977); Reub Isaacs & Co. v. Commissioner, 1 B.T.A. 45, 48 (1924); Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129; Mad Auto Wrecking, Inc v. Commissioner, T.C. Memo. 1995-153.

In this case the absence of documentation reflects not only the flexibility and informality that the circumstances permitted, but also a deliberate policy. Mohney testified that he has been indicted on obscenity charges over a hundred times. Having learned from experience that documentary evidence of his relationship to the adult entertainment businesses he controlled posed a risk of incrimination, he kept such documents to a minimum.

Contemporaneous documentation of a business relationship is not altogether lacking. On his individual income tax returns for the years 1985-91 Mohney described his principal business as consulting and reported the payments from petitioner and the other corporations he managed as gross receipts from this business. In addition, we have the uncontradicted testimony of Hagerman and Krontz that they understood a consulting agreement to exist, and the testimony of Mohney that he always expected compensation for his work. To be sure, such testimony serves their interest, but we cannot reject it for that reason alone. Lewis & Taylor, Inc. v. Commissioner, 447 F.2d 1074, 1077 (9th Cir. 1971), revg. T.C. Memo. 1969-82; Loesch & Green Constr. Co. v. Commissioner, 211 F.2d 210, 212 (6th Cir. 1954), revg. a Memorandum Opinion of this Court.

The evidence strongly suggests that Mohney did expect to receive payment in some form from petitioner. In addition to the payment in 1991, Mohney received a payment from petitioner in

1988.  He also received payments from other Mohney Group corporations that he managed under the title of "consultant" in every year between 1985 and 1991.  If the reward he expected was, as respondent contends, a return on his investment, then he expected not only the appreciation in equity value resulting from his efforts, but also distribution of some of the earnings.  Thus respondent's argument implies that Mohney expected that he could withdraw earnings from petitioner just as if he had owned a controlling interest in the corporation directly, rather than a beneficial interest in the trust that owned petitioner's shareholders.

The little evidence we have concerning the Amaranta Trust does not support this conclusion.  Mohney testified that he established the trust for the benefit of his children and grandchildren; although he too possesses a beneficial interest, the trust is structured in such a way that he cannot realize any tangible benefit during his lifetime.  This would suggest that Mohney does not have--or is not aware of having--a right to distribution of current income or right to withdraw income or corpus.  Therefore earnings of petitioner that Mohney did not cause to be paid out as compensation would not have come back to him through distributions from the trust.  Presumably a substantial share would have accrued to the other beneficiaries.  And any share of the trust's dividend income to which he may have been entitled would have been accumulated; he would not have been

able to realize this gain without selling all or part of his interest in the trust. If the trustee had arranged for petitioner to distribute dividends so that the funds could then be distributed by the trust to Mohney, he would likely have been acting in violation of his legal obligations. As a practical matter, Mohney could not have compelled Newlands to distribute trust income to him, for Mohney had no power to discharge Newlands. If Newlands retired, he would select his own successor. In the absence of any basis for doubting the independence and integrity of the trustee, we are unwilling to assume that Mohney expected him to act in derogation of his duties. The implications of respondent's argument seem therefore to be at variance from the facts. The payments that Mohney claims to have expected to receive as compensation for his services and which he ultimately received in 1988 and 1991 differed materially from the returns he received on his investment through the trust.

Respondent points out that petitioner paid Deja Vu for consulting work during the years at issue, and that Mohney was employed by Deja Vu. Therefore, if Mohney did sell his services to petitioner, those services were likely to have been fully compensated through Deja Vu's regular billings.

According to the uncontradicted testimony of Krontz, who served as both petitioner's manager and the president of Deja Vu, the consulting work that Deja Vu performed for petitioner did not

begin until sometime in 1990, at the earliest. Mohney had already been providing services to petitioner for 5 to 6 years. There is no evidence that the extent or character of Mohney's activities with respect to petitioner changed in any way after the relationship with Deja Vu commenced. Although it appears that Mohney did do some work for petitioner as an employee of Deja Vu, the scope of these services was limited to petitioner's nightclub. We believe that Mohney's involvement in general administration, advertising, legal matters, the bookstore, theater, arcade machines, and other facilities of petitioner's entertainment complex was independent of any work he performed under the Deja Vu contracts.

Respondent finds support for her disguised dividend theory in circumstances surrounding the timing of the payment. She dismisses petitioner's argument that Mohney deferred collection of his compensation until 1991 out of concern for petitioner's financial situation, pointing out that petitioner had been profitable in each year since 1986. Respondent proposes that the real reason for the payment in 1991 was concern about potential liability for the accumulated earnings tax. In this connection she attaches significance to the fact that the Internal Revenue Service audit of several Mohney Group corporations had already begun, and at some point in 1991 the revenue agent specifically raised the accumulated earnings tax issue with Shindel, the

certified public accountant who had been retained to review tax compliance within the group.

It was almost certainly not the revenue agent's inquiries that precipitated Mohney's decision to collect payment from petitioners and the other Mohney Group companies he managed. Shindel testified that the decision had already been made by November 1990. This does not mean that concern about potential liability for the accumulated earnings tax was not a principal reason for Mohney's decision, however. Shindel also testified that he had become aware of the accumulated earnings tax problem in regard to a number of Mohney Group companies before the IRS audit began, and that he discussed the problem with Mohney. The sheer number of companies making payments and the size of the amounts paid to Mohney in 1991 relative to prior years supports the inference that the 1991 payments marked a departure from Mohney's usual policy of collecting payment only as, and to the extent that, the financial situation of each company permitted. Yet even if concern over accumulated earnings tax liability was indeed the principal motivation for Mohney's decision, this fact would be no less consistent with characterization of the payment as compensation for prior services than with characterization of the payment as a disguised dividend. In the absence of documentation establishing an amount of compensation owed to Mohney for his services, Mohney would have had reason to be concerned about petitioner's ability to justify accumulations to

fund deferred compensation obligations.  Thus, the circumstances of petitioner's payment to Mohney in 1991 provide no reason to doubt that it was what it purported to be.  We are satisfied that the payment should not be recharacterized as a dividend.

Having determined that the payment is deductible, we turn to the issue of when the deduction may be taken.  Petitioner proposes to spread the $274,980 deduction ratably over the 7 taxable years to which the payment applies.  This would entail a deduction in the amount of $43,568 for each taxable year between TYE 8/31/85 and TYE 8/31/91.[3]  Petitioner is an accrual basis taxpayer.  Under the accrual method, a liability is taken into account for the taxable year in which all events have occurred that establish the fact of the liability, the amount can be determined with reasonable accuracy and economic performance has occurred.  Sec. 1.446-1(c)(1)(ii)(B), Income Tax Regs. Petitioner could not determine the amount payable to Mohney for compensation until notified thereof by Newlands during TYE

---

[3] The figure that petitioner proposes on brief as the amount of the annual deduction is $39,280 ($274,980 ÷ 7). Considering the $30,000 payment made to Mohney in 1988, the more appropriate calculation would appear to be as follows:  $274,976 = 6x + (x − $30,000); hence, x = $43,568.

Inasmuch as the first four of these taxable years are not before the Court and the period of limitations for claiming a refund with respect to these years appears to have expired, sec. 6511(a), presumably petitioner takes this position in reliance on the availability of relief under the mitigation provisions of the Code.  See secs. 1311(a), 1312(4), 1313(a)(1), and 1314(b). Resort to the mitigation provisions to reopen closed taxable years will be neither necessary nor warranted.

8/31/91.  Therefore the full $274,980 must be deducted in that year.  <u>Lucas v. Ox Fibre Brush Co.</u>, 281 U.S. 115, 120 (1930).

<u>Issue 2:  Accumulated Earnings Tax</u>

<u>Background</u>

Like many adult entertainment businesses, petitioner operated in the face of intense and unremitting hostility from residents of the local community and local government authorities.  Exclusionary zoning, stringent enforcement of building code requirements and licensing requirements, indecency ordinances and criminal prosecution are weapons commonly deployed to contain the growth of such businesses or eradicate them altogether.  The authorities of San Bernardino County used this full arsenal against petitioner.  The history of this conflict and of petitioner's other legal problems bears directly on the question of the extent of petitioner's expected and actual needs for funds during the years at issue.

Trouble with the local authorities dates back to 1985, the year in which petitioner commenced operations.  In that year the county adopted Ordinance No. 2940, which prohibited adult entertainment businesses from locating in the area where petitioner was currently operating and where a new building was being constructed for its use.  Petitioner sought an injunction against enforcement of the ordinance on the ground that it was unconstitutional.  The lawsuit concluded in 1987 with a decision

of the Ninth Circuit Court of Appeals in petitioner's favor.
Petitioner moved into the new building in 1986.

In June 1988 six women who worked as independent contractors
for petitioner were arrested for dancing in the nude at
petitioner's nightclub.  Petitioner undertook their legal defense
and bore all the costs thereof, in accordance with its policy of
offering to underwrite all the legal expenses of employees and
contractors that arose out of the business relationship. This is
common practice in the adult entertainment business.  A letter
addressed to Hagerman from petitioner's attorneys in that case
dated July 8, 1988, indicates that petitioner was contemplating a
lawsuit against the county for the purpose of invalidating the
nudity ordinance under which the dancers had been arrested.
There is no evidence that such a lawsuit was ever filed.  The
dancers were tried in June 1989, after which the representation
appears to have ended.

At least two further legal problems appear to have caused
petitioner's president especial concern during TYE 8/31/89.  One
was an ordinance that required theater operators to provide
unobstructed visibility of viewing areas from the aisle.  The
so-called "no-door ordinance" had been adopted by San Bernardino
County in July 1987, yet, for reasons that were not explained at
trial, compliance with this ordinance was an issue for petitioner
2 years later.  At this time Hagerman believed that the costs of
making the structural adjustments to petitioner's theater that

were required by the ordinance would be in the neighborhood of $50,000-$100,000. The basis for her estimate is not clear. Nor does the record disclose whether these adjustments were made during the years at issue.

Hagerman foresaw the potential for much greater expenditures in connection with the Child Protection and Obscenity Enforcement Act, Federal record keeping and labeling law that took effect in May 1989. Hagerman seems to have learned about the act from her attorneys in the first half of 1989. If petitioner was subject to liability under provisions of the act, a lawsuit challenging its constitutionality would be very costly. Based on what she had learned from the experiences of others in the business, she anticipated a protracted legal battle over several years costing hundreds of thousands of dollars. By a letter from petitioner's attorneys dated June 12, 1989, however, Hagerman was advised that as a result of a recent District Court decision holding the act unconstitutional, the U.S. Department of Justice had confirmed that it would not seek to enforce the act. Petitioner was involved in no lawsuit concerning the act during the taxable years at issue, and there is no indication in the record that petitioner's management communicated further with counsel on this subject.

Petitioner's exposure to liability increased substantially in TYE 8/31/90, as a result of the cancellation of its workers' compensation insurance policy. Petitioner attempted to obtain

replacement coverage without success.  For TYE 8/31/90 through TYE 8/31/92, petitioner was effectively self-insured.  No reserve was established to fund potential liabilities, however.

Toward the end of TYE 8/31/89, Hagerman discovered that, owing to an oversight on her part, petitioner's theater license had expired earlier in the fiscal year.  Operating without a license, petitioner was at risk of being closed down by the county at any time.  Petitioner was not closed for this reason during the years at issue, but neither were its efforts to secure renewal of its license successful.  At some time early in TYE 8/31/90, the County Building and Safety Department inspected petitioner's complex and identified several violations of the building code.  Some of these violations were promptly corrected, but over the next 1-1/2 to 2 years further inspections followed, and the violations uncovered by the Building and Safety Department multiplied.  Citations from the Building and Safety Department required remedial action in order to stay open for business.  Compliance with the building code was also a condition for renewal of petitioner's theater license.  In the early part of TYE 8/31/90, when petitioner received the first citations, Hagerman expected that the total cost of correcting the violations would amount to around $200,000-$400,000, much of which would be attributable to the cost of reinforcing the first floor ceiling with cement.  Hagerman did not obtain an estimate for the cement work from a contractor.

Meanwhile petitioner had its architects draw up plans for remodeling.  In or around January 1990, petitioner submitted these plans to the Building and Safety Department for approval. In March 1990 county officials notified petitioner that the proposed remodeling, by increasing seating capacity in the complex, would also increase the required minimum parking capacity for the complex from 36 to 55 spaces.  At the time, available parking was limited to 39 spaces.  For the next year and a half the remodeling plans were suspended while petitioner's management attempted to rent or purchase additional parking space.  After numerous inquiries, Krontz successfully negotiated for the purchase of a nearby parcel.  The sale agreement was duly submitted to the county for approval, but the county refused, on the ground that petitioner's use of the land for additional parking would contravene a preexisting ordinance imposing a moratorium on the expansion of adult entertainment businesses. Accordingly, Krontz arranged for an affiliate named MIC, Ltd. (MIC), to purchase the land and rent it to petitioner.  Under the final terms of the deal, MIC acquired the land for $490,000, financed in part by a loan of approximately $150,000 from petitioner, and MIC leased the land to petitioner at a rental rate of $8,000 per month.  The record does not disclose the dates of the sequence of events leading to the conclusion of the lease agreement.

Remodeling work began in October 1991. In November county officials closed petitioner's complex because the remodeling had been undertaken without a permit. The work was allowed to resume in January 1992 on the condition that most of it be redone in accordance with county specifications. Remodeling was completed, and petitioner reopened in the following month.

The need for parking space was only one of the reasons that petitioner's management looked for real estate during the years at issue. Hagerman was always interested in opportunities to expand the adult entertainment business to new locations. In the spring of 1989 Hagerman negotiated for the purchase of a nearby video store for a price of $163,000. In a letter to her attorney dated April 10, 1989, she explained her intentions: "This purchase should be in my name I think. Maybe we will get a corporation later. What do you think? I plan to have a partner." A draft sale agreement dated May 1989 records the purchaser as "Platinum Paradise, Inc., a California Corporation to be formed." Hagerman discussed a number of potential acquisitions with Mohney and made some inquiries. At Mohney's suggestion, in 1991 she traveled to Melbourne, Australia, to look at a brothel advertised in the Wall Street Journal. At one time Mohney identified a chicken ranch in Nevada, and at another a golf course in Mexico. Petitioner reported no real estate holdings on Schedule L of its U.S. Corporation Income Tax

Returns, Forms 1120, for any of the taxable years at issue. No written plans for petitioner's expansion were ever prepared.

The threat of exclusionary zoning or closure by county authorities provided another reason to explore other possible locations. Krontz began looking for potential relocation sites when his employment began in June 1990, and he continued his search through the remainder of the years at issue. Initially there was only an apprehension that petitioner might be required to relocate at some time in the future. With the enactment of Ordinance No. 3465 in October 1991, the date for petitioner's departure was fixed. Under the new ordinance adult entertainment businesses were prohibited in all areas where prior zoning laws had required them to locate and were permitted only in an area from which prior law had excluded them. All existing adult entertainment businesses rendered nonconforming by the zoning change were required to cease operations at their current locations by January 1, 1995. Krontz entered into negotiations for the purchase of 16 acres in Mira Loma, California. Negotiations probably began in late 1991 and continued into 1994. Petitioner made an offer for the property of $1.15 million; the owner made a counteroffer of $1.25 million. The parties were contemplating a downpayment of $100,000 and seller financing for the balance. Ultimately the parties reached agreement, but the deal was abandoned before closing on account of a preemptive zoning change in the Mira Loma area. Krontz looked for several

properties for sale or rent as potential relocation sites.  But there is no evidence of negotiations for specific properties besides the Mira Loma parcel at any time during the years at issue.

On its U.S. Corporation Income Tax Returns, Forms 1120, petitioner reported the following receipts and expenditures for each taxable year:

| Taxable Year Ended August 31 | Gross Receipts | Legal Expenses | Repair Expenses | Depr. Nonresidential Real Property Improvement Costs | Depr. Equipment Costs |
|---|---|---|---|---|---|
| 1985 | $117,092 | $1,014 | $6,592 | --- | $12,491 |
| 1986 | 192,046 | 19,174 | 3,074 | --- | 19,036 |
| 1987 | 635,823 | 51,243 | 12,656 | --- | --- |
| 1988 | 1,483,367 | 24,501 | 11,331 | --- | 255,358 |
| 1989 | 1,780,816 | 52,951 | 22,420 | --- | 8,332 |
| 1990 | 2,157,610 | 11,306 | 17,582 | $7,125 | 34,448 |
| 1991 | 2,036,202 | 4,316 | 21,394 | --- | 17,078 |
| 1992 | 1,568,110 | 14,649 | 24,823 | 352,420 | 130,523 |

Petitioner made no distributions to its shareholders before TYE 8/31/91.  In that year it distributed $65,000 as a dividend. In the following taxable year it distributed a dividend of $50,000. During the years at issue petitioner made sizeable loans to other corporations within the Mohney Group.  With the exception of the loan it made to MIC in order to help finance the acquisition of parking space for the use of petitioner's patrons, no connection between these loans and petitioner's business is apparent from the evidence.  Petitioner's loans to affiliates for purposes unrelated to its business totaled at least $50,000 in

TYE 8/31/88, $702,000 in TYE 8/31/90, and $306,000 in TYE 8/31/91.

## Discussion

Section 531 imposes a penalty tax on the accumulated taxable income of a corporation that is availed of for the purpose of avoiding tax with respect to its shareholders by permitting earnings and profits to accumulate instead of distributing them. Secs. 531, 532(a). The fact that earnings and profits have accumulated beyond the reasonable needs of the business establishes a presumption that tax avoidance was a purpose of the accumulation. Sec. 533(a). The reasonable needs of the business include reasonably anticipated future needs. Sec. 1.537-1(a), Income Tax Regs. In order to justify an accumulation for reasonably anticipated future needs, in general, the corporation must demonstrate a need warranting such accumulation and the existence, as of the end of the relevant taxable year, of specific, definite, and feasible plans to use the accumulation within a reasonable time to meet this need. Sec. 1.537-1(b), Income Tax Regs. In recognition of the informality which commonly characterizes planning within a closely held corporation, neither the regulations nor the cases require meticulously drawn formal blueprints for action. Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 332 (1968); Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 584-585 (1965). But where such documentation is lacking, the intention to dedicate

corporate resources to identified business needs must be unambiguously evidenced by some contemporaneous course of action toward this end. Cheyenne Newspapers, Inc. v. Commissioner, 494 F.2d 429, 433-434 (10th Cir. 1974), affg. T.C. Memo. 1973-52; Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 202 (4th Cir. 1957), affg. in part and revg. in part T.C. Memo. 1956-82; Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 273-274, 277 (1986). Section 534 provides that under certain circumstances the burden of proof with respect to the question whether earnings and profits have accumulated beyond the reasonable needs of the business may be shifted to the Government. The parties have stipulated that petitioner continues to bear the burden of proof. Rule 142(a).

## Working Capital

A corporation may accumulate earnings in order to provide necessary working capital for its business. Sec. 1.537-2(b)(4), Income Tax Regs. Respondent determined the amount of working capital that petitioner needed for one operating cycle by the approach originally expounded in Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200. Petitioner has offered its own Bardahl calculations.[4] The details of our own calculations

---

[4] In its trial memorandum and on cross-examination, however, petitioner questioned the use of the Bardahl analysis to determine working capital needs of a business like petitioner's that involves substantial services in addition to the sale of inventory. The measurement of petitioner's working capital needs
(continued...)

of petitioner's available net liquid assets and working capital needs are set forth in the Appendix, together with annotations discussing certain methodological issues on which we disagreed with one or both of the parties.

### Reserve for Legal Expenses

Petitioner contends that the various legal risks to which it was exposed would have justified the accumulation of a reserve for legal expenses equal to $250,000 for each of the taxable years at issue. Respondent determined that no amounts were allowable as accumulations for this purpose. We are satisfied that respondent's determination is correct.

Petitioner attempted to prove the extent of its need attributable to the policy of providing legal representation to employees and independent contractors subject to prosecution. We do not question the reasonableness of the policy. The testimony petitioner presented on this issue did not establish how much petitioner expected to require for this purpose, however.

---

[4](...continued)
is a question of fact on which petitioner has the burden of proof. Rule 142; Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 207 (4th Cir. 1957), affg. in part T.C. Memo. 1956-82. We think petitioner is correct to question the applicability to this case of a methodology developed for nonservice businesses. See Myron's Ballroom v. United States, 382 F. Supp. 582, 588 (C.D. Cal. 1974), revd. on other grounds sub nom. Myron's Enterprises v. United States, 548 F.2d 331 (9th Cir. 1977); Simons-Eastern Co. v. United States, 354 F. Supp. 1003, 1007 (N.D. Ga. 1972). But petitioner has not suggested any alternative. Therefore we shall use the parties' Bardahl calculations as the starting point for our analysis.

Hagerman testified regarding petitioner's representation of the six dancers in 1988. She was asked how much she anticipated their representation would cost at the time of their arrest. She replied: "At the time I thought around $20,000 apiece if each one had their own attorney if they didn't want us to represent-- the corporation to represent them." When asked whether she meant that petitioner was prepared to pay this amount, she confirmed that that was not the case: petitioner would have covered their legal expenses only if they did not want their own individual attorneys. Thus, while we know that petitioner paid for the dancers' defense, we do not know how much petitioner's management expected this representation would cost. The amount petitioner actually spent to defend the dancers was clearly much less than the amount Hagerman believed it would have cost the dancers to secure their own representation. The arrests occurred in June 1988, the trial June 1989. On its Forms 1120 for TYE 8/31/88 and TYE 8/31/89, petitioner reported aggregate legal expenses in the amounts of $24,501 and $52,951, respectively.

Petitioner presented no evidence that any amount was set aside for the dancers' defense. Even if some specific amount was set aside, this fact would not explain accumulations in any of the taxable years at issue, since the evidence indicates that the representation concluded before the end of the first of these years. Based on the amounts petitioner actually spent for the dancers' defense in TYE 8/31/88 and TYE 8/31/89, we are not

persuaded that petitioner's management would have believed that current cash-flows would be insufficient to finance the company's legal defense obligations to employees and contractors as they arose.

Hagerman testified regarding concerns she had during TYE 8/31/89 that the company might become involved in protracted litigation costing several hundred thousand dollars as a result of liability under the Child Protection and Obscenity Enforcement Act. We do not believe her testimony establishes a specific and definite plan to prepare for such a lawsuit. She evidently possessed no clear idea of how provisions of the act might apply to petitioner and what challenging it would entail at the time.[5] Nor does there appear to have been any reason to plan for litigation in determining whether to retain or distribute earnings at the close of TYE 8/31/89--or at the close of any subsequent taxable year--in light of the reassurances petitioner received from its attorneys in June 1989 about the Government's decision not to pursue enforcement of the act.

---

[5] When asked whether she anticipated a need to hold funds in reserve when she learned about the act, she replied: "My first inkling was we may have to fight this if we were somehow cited * * * because we weren't complying with something that we knew nothing about." "Anything when you fight the United States Government is going to cost hundreds of thousands of dollars it seems that way. It goes on and on for years." There is no evidence that her thinking on this matter advanced beyond the initial stage of vague alarm and consternation she described.

Petitioner presented expert testimony that it would have been reasonable to set aside $100,000 to $250,000 to provide for the legal expense of defending itself against exclusionary zoning. Petitioner argues that it was therefore justified in accumulating this amount in each taxable year. If petitioner in fact planned accumulations for this purpose, the accumulations may well have been justified. The existence of a reasonable need, however, does not suffice to establish the existence of a specific, definite, and feasible plan to meet the need. Snow Manufacturing Co. v. Commissioner, 86 T.C. at 277. Krontz testified that he had been expecting Ordinance No. 3465 for some time before its enactment in October 1991. Yet there is no evidence that petitioner's management formulated plans to challenge the ordinance, let alone provide for the costs of such a challenge at any time during the years at issue. Based upon the company's experience challenging the constitutionality of the predecessor of Ordinance No. 3465 between 1985 and 1987, it would have been reasonable to expect the costs of such litigation would be spread over more than 1 year and could easily be covered by the current year's cash flow. Petitioner's total legal expenses during the years of the prior litigation amounted to only approximately $70,000. We are not persuaded that any portion of the accumulations for TYE 8/31/89 through TYE 8/31/92 can be accounted for by plans to provide for anticipated legal expenses.

Workers' Compensation

Petitioner argues that owing to the cancellation of its workers' compensation insurance, it was justified in accumulating $50,000 in each of TYE 8/31/90 through TYE 8/31/92. Respondent properly allowed no amounts as a reserve for this purpose. There is no question that petitioner would have been justified in reserving funds for self-insurance. Petitioner's argument fails because there is no evidence to substantiate the existence of a plan to accumulate $50,000 or any other amount specifically to meet this need. The testimony of petitioner's president leaves little doubt that there was no such plan.[6]

## Business Interruption

Petitioner alleges on brief that it had always planned for a business interruption like the one it experienced from November 1991 through February 1992, and that it recognized the need to reserve funds. Therefore "prudent business practice requires retaining an amount of earning equal to three (3) months operating expenses because of the nature of the business." The

---

[6] After counsel elicited from Hagerman the general observation that "the size of lawsuits these days--everybody asks for at least a half a million to several million for no matter what they do," the following colloquy occurred:
Q:   Did--but did you consider yourself a minimum amount that Eyefull should have on hand in the event that any employee was injured?
A:   No, not really, knowing that you'd need at least a half a million. I would just guess a half a million.
Q:   Did you as president of Eyefull set aside some funds for that contingency?
A:   Not particularly for the Workers' Comp. There was always funds set aside for the rainy days. I suppose that would be a rainy day problem.

record contains no support for these allegations. That petitioner's business was interrupted for 3 months does not imply that petitioner could have expected or did expect the need for a 3-month reserve. Nor do we understand why operating costs, which are generally not incurred during a period of business suspension, would be an appropriate measure of the funds needed. The argument is a transparent effort to rationalize accumulations after the fact, and respondent properly rejected it.

### Building Improvements and Equipment Replacement

Petitioner contends that plans for building improvements and investment in new equipment, both executed during TYE 8/31/92, justify accumulations of $450,000 at the end of TYE 8/31/90 and TYE 8/31/91. Respondent allowed no amounts for these purposes for either taxable year.

On its Form 1120 for TYE 8/31/92, petitioner reported capital expenditures for building improvements carried out between October 1991 and February 1992 at a cost of $352,420. Testimony confirmed that this work consisted, in part, of remodeling for which petitioner had submitted an architect's plans to the county for approval in or around January 1990. In part, the work also involved correction of building code violations. Petitioner had been notified of building code violations on several occasions between early TYE 8/31/90 and TYE 8/31/91, and internal corporate documents indicate that some of these violations were corrected before TYE 8/31/92. The most

costly structural changes, including cement reinforcement of the first floor ceiling, were probably performed at the same time as the remodeling work in TYE 8/31/92 because the expenditures for repairs and improvements reflected on petitioner's tax returns for TYE 8/31/89, TYE 8/31/90, and TYE 8/31/91 are comparatively modest and do not even approach Hagerman's estimate of the total cost of compliance.  The need to make these structural changes had been identified in TYE 8/31/90, and specific plans for compliance were required.  Consequently we believe that the plans that were eventually executed at a cost of $352,420 in the first half of TYE 8/31/92 could reasonably explain an accumulation of approximately this amount at the end of both TYE 8/31/90 and TYE 8/31/91.

Under some circumstances, a lengthy delay in the execution of alleged plans invites skepticism as to whether the plans were sufficiently definite and specific to satisfy the requirements of the regulations.  See Suwannee Lumber Manufacturing Co. v. Commissioner, T.C. Memo. 1979-477; sec. 1.537-1(b), Income Tax Regs.  In this case the delay is understandable. Remodeling was contingent on county approval, county approval was contingent on the availability of additional parking space, and coordination of the major structural corrections with the elective remodeling work was likely to have been efficient from both an economic and architectural standpoint.  Considering the bureaucratic and technical complications, we do not interpret a delay of 1 to 2

years as an indication that petitioner lacked either a clear idea of the work to be done or a determination to do it as soon as practicable.

Petitioner's tax return for TYE 8/31/92 shows that $130,523 was incurred in that year to acquire numerous items of depreciable property ranging in cost from a few hundred to a few thousand dollars. The property consists of lighting, sound system, video vender booths, and the like, for the most part equipment that would have been used for normal business operations. Virtually all the items were classified as 7-year property for ACRS purposes. During the 7-year history of its business operations, in only one other year, TYE 8/31/88, had petitioner made comparable expenditures on equipment. Some of the purchases seem to represent normal replacement; some may represent expansion of capacity concomitant with the remodeling work that occurred in the same year. The nature of the items and the circumstances of their acquisition suggest that the expenditures could reasonably have been anticipated as of the end of TYE 8/31/90 and TYE 8/31/91. But nothing in the record confirms that large-scale equipment replacement and expansion of capacity were in fact contemplated at these times. The evidence is equally consistent with the inference that, for most of the items, the purchase decision was made during TYE 8/31/92. Even if petitioner's management did plan the acquisitions prior to TYE 8/31/92, the total cost was not so large in relation to

petitioner's cash flow that they could not reasonably have expected to be able to finance the acquisitions without accumulation. Therefore the acquisitions do not explain any part of the accumulations in TYE 8/31/90 and TYE 8/31/91.

### Parking

Petitioner argues that its efforts to secure additional parking to comply with County Building and Safety Department requirements justify an accumulation of $500,000 in TYE 8/31/91 and TYE 8/31/92. Respondent allowed no amount for this purpose.

Petitioner presented evidence of only one definite purchase plan that would have warranted an accumulation in any of the years at issue. This was the plan to acquire the property that petitioner is currently renting from MIC. Once petitioner concluded leasing arrangements with MIC, its needs would have been satisfied and no accumulation of funds to acquire property for parking would be justified. No evidence in the record fixes the time of this transaction. We can confidently infer, however, that petitioner and MIC had reached an agreement before the end of TYE 8/31/92, because the loan to MIC, which partly financed MIC's acquisition of the rental property, appears on petitioner's tax return for TYE 8/31/92.

It is possible that petitioner had already abandoned its plan to purchase the property before the end of TYE 8/31/91. Krontz testified that petitioner paid MIC $8,000 per month, or $96,000 per year under the lease. On its tax return for TYE

8/31/92, petitioner claimed a deduction for rent that was $91,681 higher than the deduction it had claimed for TYE 8/31/91. If the increase in rental payments was attributable to the MIC lease, then petitioner paid MIC an amount corresponding to slightly less than 11-1/2 months rent. The lease might therefore have taken effect within the first few weeks of TYE 8/31/92.

Corroboration of this inference can be found in the fact that after a delay of 1-1/2 years due largely to its inability to comply with the county parking requirements, petitioner commenced remodeling work in October 1991, the second month of TYE 8/31/92. To have proceeded with its remodeling plans before securing additional parking space in defiance of the Building and Safety Department would have been self-defeating and utterly inconsistent with the deferential and responsible attitude that petitioner's management had hitherto displayed in its dealings with the department. If petitioner began leasing the property just after the start of TYE 8/31/92, there is a high probability that by the end of TYE 8/31/91 either there was an agreement in principle with MIC or the county had rendered its decision denying approval to petitioner's plan to purchase the property. In either case the abandoned purchase plan could not justify any part of the accumulations at the end of TYE 8/31/91. Having failed to fix the chronology of these events more precisely in relation to the close of TYE 8/31/91, petitioner has not satisfied its burden of proof.

Expansion and Relocation

Petitioner attempted to prove that its accumulations were needed to finance costs of relocation amounting to $1 million or more and to finance the expansion and diversification of its business.  Respondent determined that no accumulations were allowable for these purposes.

There is no basis for concluding that petitioner reasonably retained earnings for expansion or diversification during the years at issue.  Hagerman testified regarding a number of specific investment possibilities that she considered.  The only one for which there is evidence of actual negotiations was the video store that she offered to purchase in 1989.  Contrary to her account at trial, however, contemporaneous documents indicate that she was not negotiating the acquisition on petitioner's behalf.

The threat to petitioner's continued operation that arose first from the expiration of its theater license and later from Ordinance No. 3465 would have warranted financial preparations for relocation.  The various costs of reestablishing petitioner's business in a new location would have been substantial.  Hagerman anticipated that they could exceed $1 million.  It does not follow, however, that petitioner's management had specific, definite, and feasible plans to provide for such costs.  If after expiration of the theater license petitioner's management recognized a need to accumulate $1 million and were determined to

do so, the financial policies they actually implemented in TYE 8/31/90 and TYE 8/31/91 belied their intentions.

In TYE 8/31/90, petitioner made loans unrelated to its business totaling $702,000, leaving it with net liquid assets sufficient to cover only its needs for working capital and a portion of the expected costs of remodeling (see Appendix Table 2). If all the loans had been made early in the taxable year, one might be able to argue that petitioner's management approved them on the basis of an overestimate of petitioner's earnings for the year. In fact the loans were made throughout the year.

In TYE 8/31/91, we observe a similar pattern. Petitioner ended the taxable year with a modest excess of net liquid assets over its needs for working capital and remodeling (see Appendix Table 2). But it could have accumulated an additional $650,000 toward the $1 million target if it had not made further loans unrelated to its business totaling $306,000 and in the last month of the taxable year transferred $340,000 in precious metal holdings to Mohney and its shareholders. If these assets were genuinely needed for a relocation fund, a distribution to the shareholders could not be justified. Nor was there an obligation to pay the consulting fees. Since TYE 8/31/85, Mohney had permitted petitioner to defer payment of the fees so long as financial circumstances required retention of the funds. During TYE 8/31/90 and TYE 8/31/91, petitioner's management looked for replacement property, but there is no evidence that their

inquiries advanced to the point of negotiating for any of the properties they saw.

Petitioner's situation changed markedly in TYE 8/31/92. The taxable year began with the enactment of Ordinance No. 3465 requiring petitioner to relocate by January 1, 1995. If this were not sufficient to impress petitioner's management with the urgent need for resolute action, shortly thereafter they received a strong foretaste of the fate that awaited when, in November, county officials closed petitioner's complex and business stopped. Now Krontz' searches bore fruit. A property was identified in Mira Loma. An offer of $1.15 million was made; a counteroffer of $1.25 million was received. Negotiations over details of the transaction carried over into the next taxable year. There is no evidence that petitioner made any loans unrelated to its business in TYE 8/31/92.

Once petitioner's management had concrete prospects of an investment exceeding $1 million, the likelihood that they took this into account in their financial planning greatly increases. How much they could reasonably have accumulated for this purpose is not clear. The Mira Loma deal would have involved seller financing: to acquire the property petitioner would have had an immediate need for only the $100,000 downpayment. But there would have been various other costs as well, including construction costs and costs to secure permits and favorable zoning. Petitioner did not prove exactly how much it would have

needed.  But we need not determine this.  We need only determine whether petitioner has adequately explained the excess of its net liquid assets as of the close of TYE 8/31/92 over the amount it would have required for working capital.  This excess was approximately $45,000 (see Appendix Table 2).  Since the required downpayment alone would have exceeded this amount, we are satisfied that petitioner did not allow its earnings to accumulate beyond the reasonable needs of its business in this year.

### Conclusions

Table 2 in the Appendix sets forth the calculations supporting our conclusion that petitioner allowed its earnings to accumulate beyond the reasonable needs of its business for the first 3 of the 4 taxable years at issue.  The underlying methodology is well established in the case law and requires no elaboration.  See Snow Manufacturing Co. v. Commissioner, 86 T.C. at 280-282; Alma Piston Co. v. Commissioner, T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978); Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200; Grob, Inc. v. United States, 565 F. Supp. 391 (E.D. Wis. 1983).  For purposes of comparing petitioner's reasonable needs with the net liquid assets available to meet those needs, the loans made to affiliates for purposes that had no relation to petitioner's business are treated as liquid assets.  Faber Cement Block Co. v.

Commissioner, 50 T.C. at 330; Bardahl Manufacturing Corp. v. Commissioner, supra.

The fact that a corporation accumulated earnings and profits beyond the reasonable needs of the business is determinative of the purpose to avoid income tax with respect to its shareholders, unless the corporation proves the contrary by a preponderance of the evidence. Sec. 533(a). This presumption cannot be rebutted merely by evidence that tax avoidance was not the exclusive, primary or dominant motive for the accumulations: to escape liability for the accumulated earnings tax the corporation must prove that tax avoidance was not one of the purposes. United States v. Donruss Co., 393 U.S. 297 (1969). Cases in which unreasonable accumulations have been fully explained by legitimate corporate considerations are few. See, e.g., Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566 (1965).

Viewing the record as a whole, we find that petitioner had a general policy of retaining its earnings. As petitioner's president confirmed when asked whether the company was setting aside funds or whether she herself made a decision to set aside funds for any purpose during the years at issue: "It was not a conscious decision. We knew always that you had to have funds for anything that you would want to expand, or build, or do renovations." By routinely retaining earnings, whether or not an identifiable need for a specific amount existed at the time, petitioner's management assured themselves that, as she put it,

"there was always funds set aside for the rainy days."
Petitioner accumulated partly to provide for its own potential
needs.  Evidently an understanding existed among companies within
the Mohney Group that any surplus accumulated by one member
should be made available to other members who needed the funds.
"We are all friends, we help each other out," Hagerman explained.
Thus, through loans to its affiliates of over $1 million in TYE
8/31/90 and TYE 8/31/91, petitioner's surpluses were applied to a
constructive use somewhere in the group.

Petitioner attempts to justify its policy by the observation
that commercial lending is essentially impossible for adult
entertainment businesses to obtain.  This may well be true, but
it does not satisfactorily account for the retention of earnings
without specific, definite, and feasible plans to use them.  By
consenting to the accumulation and pooling of earnings by
petitioner and other members of the Mohney Group, the common
owners were implicitly providing the financing that was
unavailable from commercial sources.  If petitioner had regularly
distributed surplus funds, there is no reason to expect that its
shareholders would not have been willing to reinvest their
dividends in the Mohney Group wherever and whenever a definite
need arose.  Petitioner's explanation is not sufficient to rule
out the possibility that its policy was designed to serve tax
avoidance purposes as well.  Petitioner has not carried its
burden of proof.  Accordingly, it is liable for accumulated

earnings tax for TYE 8/31/89, TYE 8/31/90, and TYE 8/31/91 in the amounts of $26,105, $159,153, and $93,515, respectively (see Appendix Table 2).

## Issue 3:  Additions to Tax and Penalties

### Background

During the taxable years at issue petitioner retained Modern Bookkeeping, Inc. (Modern), to provide bookkeeping services and to prepare petitioner's tax returns.  In late 1987 Modern had hired Certified Public Accountant David Shindel (Shindel) to oversee tax compliance with respect to five of Modern's clients.  Shindel supervised the preparation of work papers and tax returns and signed the returns when satisfied that they reasonably complied with the tax laws.  The scope of Shindel's engagement was extended to petitioner by 1989.  In the course of his review, he soon became concerned that petitioner's sizeable retained earnings might subject it to liability for the accumulated earnings tax.  He attempted to determine whether the accumulations were reasonable.  At some time in 1989 he brought this problem to Mohney's attention, because he knew Mohney was actively involved in petitioner's management.

Shindel prepared and signed petitioner's Forms 1120 for each of the taxable years at issue.  The Forms 1120 for TYE 8/31/89, TYE 8/31/90, and TYE 8/31/91 were filed on November 14, 1990, December 11, 1991, and June 3, 1992, respectively.  In her notice of deficiency, respondent determined that petitioner was liable

for additions to tax under section 6651 for TYE 8/31/89, TYE 8/31/90, and TYE 8/31/91; the addition to tax under section 6653(a) for TYE 8/31/89; and accuracy-related penalties under section 6662(a) for TYE 8/31/90 and TYE 8/31/91.

## Discussion

An addition to tax is imposed under section 6651 for failure to file a return within the prescribed period, unless it is shown that such failure was due to reasonable cause and not due to willful neglect.  Sec. 6651(a)(1).  The amount of the addition is 5 percent of the amount required to be shown as tax for each month that the delinquency persists, up to a maximum of 25 percent.  Delinquent filing is due to reasonable cause if the taxpayer exercised ordinary business care and prudence, but was nevertheless unable to file its tax return in a timely manner.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Reliance upon a professional return preparer does not constitute reasonable cause for failure to meet the filing deadline.  United State v. Boyle, 469 U.S. 241, 253 (1985).  The burden of proving reasonable cause and the absence of willful neglect is on the taxpayer.  Rule 142(a).

Petitioner filed its returns for TYE 8/31/89 and TYE 8/31/90 approximately 1 year late and its return for TYE 8/31/91 more than 6 months late.  Petitioner argues that it exercised ordinary business care and prudence because it relied upon Modern to

handle its returns.  United States v. Boyle, supra, forecloses this argument.  Petitioner is liable for the addition to tax.

For TYE 8/31/89, section 6653(a) provides for an addition to tax equal to 5 percent of an underpayment of tax if any part of the underpayment is due to negligence.  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code.  Sec. 6653(a)(3).  For purposes of section 6653(a), the term "underpayment" has the same meaning as "deficiency" as defined in section 6211(a), except that the amount shown on the return is treated as zero if the return was filed after the prescribed deadline, including any extension. Sec. 6653(c)(1).  Delinquent filing is prima facie evidence of negligence.  Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990).  Where the taxpayer cannot prove reasonable cause and the absence of willful neglect for purposes of section 6651(a)(1), the taxpayer cannot carry its burden of proof for purposes of section 6653(a).  Condor Intl., Inc. v. Commissioner, 98 T.C. 203, 225 (1992), affd. in part and revd. in part 78 F.3d 1355 (9th Cir. 1996).

Since petitioner's return for TYE 8/31/89 was untimely filed, the entire amount of the tax due is treated as an underpayment.  Since this underpayment was attributable to

conduct that constitutes negligence and petitioner can offer no excuse, it is liable for the addition to tax.[7]

Section 6662(a) and (b)(1)[8] imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to negligence. For purposes of section 6662, unlike section 6653, the amount shown on a late return is not treated as an underpayment. Sec. 6664(a)(1). Consequently delinquency, by itself, is not grounds for the accuracy-related penalty. Sec. 1.6662-2(a), Income Tax Regs. As under prior law, "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code. Sec. 6662(c). A position with respect to an item is attributable to negligence if the taxpayer failed to maintain adequate records to substantiate

---

[7] Cf. Lazore v. Commissioner, 11 F.3d 1180, 1188-1189 (3d Cir. 1993), revg. in relevant part T.C. Memo. 1992-404 (holding that an underpayment was not attributable to delinquency because the taxpayers would have reported no tax due even if they had filed on time). In a footnote to its decision, the Court of Appeals for the Third Circuit questioned the soundness of the holding in Emmons v. Commissioner, 92 T.C. 342 (1989), affd. 898 F.2d 50 (5th Cir. 1990), that in the absence of extenuation delinqency is grounds for imposition of the addition to tax under sec. 6653. Lazore v. Commissioner, supra at 1189 n.4. Although we reaffirm our belief in the logic of Emmons v. Commissioner, supra and Condor Intl., Inc. v. Commissioner, 98 T.C. 203 (1992), affd. in part and revd. in part 78 F.3d 1355 (9th Cir. 1996), we note that our result for TYE 8/31/89 would not differ under the negligence analysis we use in applying sec. 6662(a) and (b)(1) to TYE 8/31/90 and TYE 8/31/91, infra. See Pessin v. Commissioner, 59 T.C. 473, 489 (1972).

[8] Although the notice of deficiency determined negligence (sec. 6662(b)(1)) and substantial understatement (sec. 6662(b)(2)) as alternative theories for imposition of the penalty, on brief respondent pursued only the former theory.

it properly.  Valadez v. Commissioner, T.C. Memo. 1994-493;
sec. 1.6662-3(b), Income Tax Regs.

The accuracy-related penalty does not apply to any part of
an underpayment for which the taxpayer had reasonable cause and
acted in good faith.  Sec. 6664(c)(1).  In order for reliance on
the judgment of a competent tax return preparer to qualify for
this exception, the taxpayer must demonstrate that the return
preparer formed his judgment on the basis of information that the
taxpayer believed, and had reason to believe, was complete and
accurate.  United Circuits, Inc. v. Commissioner, T.C. Memo.
1995-605; Conway v. Commissioner, T.C. Memo. 1994-405; Saghafi v.
Commissioner, T.C. Memo. 1994-238; sec. 1.6664-4(b)(1), Income
Tax Regs.

The underpayments for TYE 8/31/90 and TYE 8/31/91 are
attributable to a bad debt deduction that was conceded before
trial and unreasonable accumulations of earnings.  Petitioner
presented no evidence in regard to the basis for the bad debt
deduction that it did not litigate.  It could offer scarcely more
documentation to substantiate the business plans by which it
attempted to justify its accumulations.  The underpayments are
therefore attributable to negligence.

Petitioner takes the position that the unsubstantiated
positions to which the underpayments are attributable can be
justified by its reliance on Modern.  Shindel prepared and signed
petitioner's tax returns for both years.  His experience and

qualifications clearly were sufficient to warrant reliance upon his judgment. Yet without knowing what Shindel understood the purposes for the accumulations to be and on what information this understanding was based, we cannot conclude that petitioner reasonably and in good faith relied on his judgment. Shindel discussed the accumulated earnings problem with Mohney, petitioner's de facto chief executive. Counsel might have elicited from Shindel and/or Mohney testimony bearing on this important question. It remains, however, unanswered. Petitioner could not have underpaid its tax in good faith if, as section 533(a) requires us to presume, petitioner's management permitted corporate earnings to accumulate unreasonably in order to defer shareholder-level withholding tax, and they were aware that this motive subjected petitioner to liability for the accumulated earnings tax. Petitioner has not satisfied its burden of proof. The accuracy-related penalty therefore applies.

To reflect the foregoing,

Decision will be entered
under Rule 155.

Appendix

Table 1

| Bardahl Computations | TYE<br>Aug. 31, 1989 | TYE<br>Aug. 31, 1990 | TYE<br>Aug. 31, 1991 | TYE<br>Aug. 31, 1992 |
|---|---|---|---|---|
| Operating Expenses | [1,2]1,452,981 | [9,10]1,596,783 | [15,16]1,807,151 | [23]1,838,351 |
| Cost of Goods Sold | 324,128 | 433,311 | 440,046 | 322,254 |
| Peak Inventory | 93,197 | 93,197 | 68,597 | 68,597 |
| Days in Inventory Cycle | 104.95 | 78.50 | 56.90 | 77.70 |
| Days in Receivables Cycle | – 0 – | – 0 – | – 0 – | 0.88 |
| Average Payables | 77,840 | 41,665 | 37,384 | 38,549 |
| Days in Credit Cycle | [3]19.55 | [11]9.52 | [17]6.85 | [24]7.65 |
| Days in Operating Cycle | 85.40 | 68.98 | 50.05 | 70.05 |
| Amount of Working Capital Needs,<br>  One Cycle | [4]339,943 | [12]301,753 | [18]247,580 | [25]352,793 |
| Current Assets | [5]673,078 | 925,474 | [19]1,211,367 | [26]504,060 |
| Current Liabilities | [6]243,264 | 405,318 | [20]452,127 | 106,638 |
| Net Liquid Assets Available<br>  for Needs | 429,814 | 520,156 | 759,240 | 397,422 |

Computation of Accumulated
Taxable Income

| | | | | |
|---|---|---|---|---|
| Taxable Income | [7]656,329 | [13]1,107,258 | [21]736,378 | 166,160 |
| Less Income Taxes Paid or Accrued | [8]223,152 | [8]376,468 | [22]205,535 | 56,494 |
| Less Dividends Paid Deduction | – 0 – | – 0 – | 65,000 | 50,000 |
| Current Earnings and Profits<br>  Retained | 433,177 | 730,790 | 333,981 | 59,666 |
| Less Accumulated Earnings Credit | 339,943 | 162,387 | – 0 – | 59,666 |
| Accumulated Taxable Income | 93,234 | 568,403 | 333,981 | – 0 – |

Table 2

| TYE | (1) Accumulated Earnings & Profits | (2) Increase In Earnings & Profits Over Prior Year | (3) Net Liquid Assets Available | (4) Anticipated Working Capital Needs For One Cycle | (5) Anticipated Extraordinary Needs | (6) Total Reasonable Needs (4)+(5) | (7) Excess Liquid Assets (3)-(6) | (8) Investment Unrelated To Business | (9) Loans Unrelated To Business | (10) Accumulation Beyond Reasonable Needs (3)+(8)+(9)-(6) |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/88 | 268,371 | | | | | | | | | |
| 8/31/89 | 701,548 | 433,177 | 429,814 | 339,943 | -0- | 339,943 | 89,871 | -0- | -0- | 89,871 |
| 8/31/90 | 1,432,338 | 730,790 | 520,156 | 301,753 | 352,000 | 653,753 | (133,597) | -0- | 702,000 | 568,403 |
| 8/31/91 | 1,766,319 | 333,981 | 759,240 | 247,580 | 352,000 | 599,580 | 159,660 | -0- | 306,000 | 465,660 |
| 8/31/92 | 1,825,985 | 59,666 | 397,422 | 352,793 | >44,629 | >397,422 | -0- | -0- | -0- | -0- |

| | TYE 8/31/89 | TYE 8/31/90 | TYE 8/31/91 | TYE 8/31/92 |
|---|---|---|---|---|
| (1) Assets in columns (3)+(8)+(9) | 429,814 | 1,222,156 | 1,065,240 | 397,422 |
| (2) Less current earnings and profits retained | 433,177 | 730,790 | 333,981 | 59,666 |
| (3) Prior accumulation available for reasonable needs | -0- | 491,366 | 731,259 | 337,756 |
| (4) Reasonable needs | 339,943 | 653,753 | 599,580 | >397,422 |
| (5) Current earnings and profits retained for reasonable needs (4)-(3) sec. 535(c)(1) | 339,943 | 162,387 | -0- | 59,666 |
| (6) Accumulated taxable income (2)-(5) sec. 535(a) | 93,234 | 568,403 | 333,981 | -0- |
| Accumulated earnings tax sec. 531 | 26,105 | 159,153 | 93,515 | -0- |

Annotations to Table 1

TYE 8/31/89

1.  In computing operating expenses for the year, respondent excluded amounts as to which a claim for deduction was disallowed in the notice of deficiency.  After trial respondent conceded that payments for insurance premiums were properly deducted as ordinary and necessary expenses.  Therefore we have included them.

2.  Respondent included in operating expenses for the year the amount of Federal income tax determined in the notice of deficiency.  The taxes that should be taken into account are petitioner's estimated tax payments.  Doug-Long, Inc. v. Commissioner, 72 T.C. 158, 176-177 (1979); Empire Steel Castings, Inc. v. Commissioner, T.C. Memo. 1974-34.

3.  Respondent calculated the length of petitioner's credit cycle by multiplying the number of days in the year by a quotient of which the numerator is peak payables for the year and the denominator is total merchandise purchased for the year.  Petitioner argues that the length of its credit cycle for each of the taxable years at issue was no more the 10 days.  The basis for this figure is Hagerman's testimony that petitioner regularly paid its bills every 2 weeks.  Our cases

do not prescribe a single method for determining credit cycle. However, the data do not corroborate petitioner's position and we are not aware of any authority for respondent's formula. Accordingly, we have used the quotient of average payables divided by total operating expenses. See Snow Manufacturing Co. v. Commissioner, 86 T.C. 260 (1986); Kingsbury Invs., Inc. v. Commissioner, T.C. Memo. 1969-205.

4. The amount of working capital that a taxpayer could reasonably expect to need for one operating cycle is determined by multiplying total operating expenses for 1 year by the length of its operating cycle expressed as a fraction of a year. In her Bardahl calculations, respondent used the current year's operating expenses for this purpose. This Court has often found it more appropriate to use the actual operating expenses for the subsequent year as a proxy for the amount of operating expenses that the taxpayer expected as of the close of the year. Empire Steel Castings, Inc. v. Commissioner, supra; Delaware Trucking Co. v. Commissioner, T.C. Memo. 1973-29. The use of subsequent year operating expenses for purposes of this calculation will result in a higher estimate of working capital needs when a business' costs are subject to inflation or the business is growing. Petitioner argues that respondent should have used its operating expenses for the subsequent year. One problem with petitioner's position is that for TYE

8/31/92 current year operating expenses must be used because data on subsequent year operating expenses were not presented in evidence. The more important problem is that petitioner has suggested no reason to believe that the assumption of perfect foresight would produce a closer approximation of the amount petitioner actually estimated it would need at the time. Ultimately the question is one of fact, and petitioner has not satisfied its burden of proof. We have used current operating expenses.

5. Respondent included prepaid expenses in current assets. This treatment of prepaid expenses is supported by authority. Bardahl Intl. Corp. v. Commissioner, T.C. Memo. 1966-182. Petitioner argues that this is inappropriate, since prepaid expenses are not funds available for distribution to shareholders. In the Bardahl analysis we compare working capital needs with available net liquid assets. What matters is not the absolute amounts, but the difference between them. For purposes of this comparison, including prepaid expenses in available net liquid assets is effectively equivalent to deducting these expenses from working capital needs.

6. In the worksheet accompanying the notice of deficiency the amount of "other current obligations" was stated as $195,801, a figure taken directly from petitioner's Form 1120, Schedule L, for TYE 8/31/89. Schedule L discloses that

the amount consists of State and Federal taxes payable. Respondent revised this figure to $21,985 in the <u>Bardahl</u> calculations she prepared for trial. The revision has the effect of increasing available net liquid assets, the excess of new liquid assets over working capital needs, and hence the accumulated earnings tax liability. Therefore the revision constitutes "new matter" for which respondent bears the burden of proof. Rule 142(a); <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890 (1981). Respondent provided no explanation at trial. Consequently we must use the figure originally accepted in the notice of deficiency.

7. The starting point for computing accumulated taxable income is petitioner's correct taxable income for the year. Sec. 535(a). The figure used by respondent improperly failed to reflect a deduction for the insurance premium.

8. In her computation of accumulated taxable income respondent deducted from taxable income the amount of Federal income tax due for the year as determined in the notice of deficiency. This was an error. Section 535 provides for the deduction of Federal income tax accrued during the taxable year. Sec. 535(b)(1). For this purpose a tax liability is not treated as accrued during the taxable year if the taxpayer contested it at the time it was proposed. <u>Dixie Pine Prods. Co. v. Commissioner</u>, 320 U.S. 516 (1944); <u>Goodall's Estate v.</u>

Commissioner, 391 F.2d 775 (8th Cir. 1968), revg. T.C. Memo. 1965-154; Doug-Long, Inc. v. Commissioner, 73 T.C. 71 (1979); sec. 1.535-2(a)(1), Income Tax Regs.  Accordingly, we use the amount of Federal income tax shown on petitioner's return.

TYE 8/31/90

9.  See note 1.

10.  See note 2.

11.  See note 3.

12.  See note 4.

13.  See note 7.

14.  See note 8.

TYE 8/31/91

15.  Operating expenses should include the amount of consulting fees paid to Mohney, which petitioner properly deducted as an ordinary and necessary business expense.

16.  No estimated Federal income tax payments were in fact made. Arguably, estimated tax payments should be included in operating expenses even if not actually made, because petitioner would have expected to comply with the requirement to pay estimated tax in the following taxable year.  For the sake of consistency we include only estimated taxes that petitioner paid, but this should not distort the results of our analysis.  The unpaid tax seems to have been included in the amount of "current liabilities" stated on Form 1120, Schedule

L, for TYE 8/31/91, which we have used to determine available net liquid assets. Thus, if we omit unpaid estimated tax from the calculation of working capital needs, the effect is offset by a corresponding reduction in available net liquid assets.

17. See note 3.

18. See note 4.

19. For reasons that were not explained, in her Bardahl computations for trial respondent omitted an investment in gold listed on petitioner's Form 1120, Schedule L. Respondent had included this item in the worksheet accompanying the notice of deficiency. Since the investment appears to be a cash equivalent, its inclusion in current assets would appear to be appropriate.

20. We use the amount of "other current obligations" stated on Form 1120, Schedule L, and accepted by respondent in computations on the worksheet accompanying the notice of deficiency. The revised amount that she used in computations for purpose of trial was not explained. See note 6.

21. Taxable income reflects amounts properly deducted for insurance premiums and consulting fees.

22. See note 8.

TYE 8/31/92

23. See note 2.

24. See note 3.

25.  See note 4.

26.  We use the year-end balance stated on Form 1120, Schedule L, and the worksheet accompanying the notice of deficiency.  For reasons that were not explained, in her Bardahl computations for trial respondent used the much higher balance for the beginning of the year, which has the effect of increasing available net liquid assets and, ultimately, accumulated earnings tax liability.  Thus, the revision would constitute "new matter" for which respondent offered no proof.